## Case No. 2,852.

### CLARKE v. FOSS et al.

[7 Biss. 540;[1] 17 N. B. R. 261; 10 Chi. Leg. News. 211.]

District Court, W. D. Wisconsin. March, 1878.[2]

CONTRACTS FOR FUTURE DELIVERY—SECRET INTENTION—MUTUAL INTENT.

1. A contract for the delivery at a future time of personal property, which the seller has not on hand when the contract is made, nor any means of getting it, is not void for illegality.

2. The secret intention of one of the contracting parties not to fulfill his contract, uncommunicated to the other, is not enough to make the transaction illegal.

[Approved in Ward v. Vosburgh, 31 Fed. 14.]

3. The intent that such a transaction should be a mere betting on the market, without any expectation of actual performance, must be mutual, and constitute an integral part of the contract, in order to render it invalid.

[Approved in Ward v. Vosburgh, 31 Fed. 14.]

[1] [Reported by Josiah H. Bissell, Esq., and here reprinted by permission.]

[2] [Affirmed by circuit court (opinion orally delivered, and nowhere reported).]

4. If the contracts were valid in their inception and not tainted with any gambling intent or device, a subsequent mutual settlement by the parties, by payment of differences, instead of by actual delivery, cannot make them void for illegality.

[Approved and applied in Gilbert v. Gauger, Case No. 5,412; Ward v. Vosburgh, 31 Fed. 15, 16; Cited in Third Nat. Bank v. Harrison, 10 Fed. 250; Jackson v. Foote. 12 Fed. 41; Hentz v. Jewell, 20 Fed. 593.]

5. Many authorities cited and commented upon.

[In bankruptcy. Bill by Charles Edward Clarke, assignee. etc., against Sylvester D. Foss and others.]

Thomas & Fuller, and H. M. Lewis, for complainants.

Dent & Black and Burr W. Jones, for defendants.

William P. Black, for defendants, cited the following authorities: In this case the lex loci contractus determines the rights of the respective parties. These contracts were made and to be performed in Chicago, and are therefore to be governed by the laws of the state of Illinois. Edw. Bills & N. §§ 177, 185; Stacy v. Baker, 1 Scam. 417. These contracts were valid under the decisions of Illinois. Pixley v. Boynton, 79 Ill. 351; Logan v. Musick, 81 Ill. 415; Wolcott v. Heath, 78 Ill. 433; Lyon v. Culbertson, 83 Ill. 33 (dissenting opinion of Mr. Justice Dickey). Such contracts are also held valid by the courts of other states of the United States, and by the English decisions. Rumsey v. Berry, 65 Me. 570; Hibblewhite v. McMorine, 5 Mees. & W. 462; Petrie v. Hannay, 3 Term R. 418; Owen v. Davis, 1 Bailey, 315; Porter v. Viets [Case No. 11.291]; Lehman v. Strassberger [Id. 8,216]; Knight v. Fitch, 80 E. C. L. 566; Rosewarne v. Billing, 109 E. C. L. 316.

BUNN, District Judge. This is a suit in equity begun by the assignee of C. B. Stevens & Sons. bankrupts, to set aside and cancel six certain promissory notes for the sum of one thousand two hundred and thirty-one dollars and ten cents each, aggregating seven thousand three hundred and eighty six dollars and sixty cents, and a mortgage upon real estate in De Soto, in Vernon county, Wisconsin, to secure the same, executed by C. B. Stevens & Sons to the defendants, December 1, 1874, on the ground that the same are void as being given to secure a consideration arising out of certain option contracts for the sale and delivery of grain, which it is claimed were wagering contracts, under the laws of Illinois in force at that time.

The bankrupts were and for many years prior to the fall of 1874, when these transactions occurred, had been merchants and dealers in grain and produce upon the Mississippi river at De Soto, Wisconsin, and, as such, had for several years purchased and shipped wheat and other grain to the defend-

ants, who were commission merchants at Chicago, and members of the board of trade for twenty years or more, doing business under the firm name of S. D. Foss & Co., and had, also, from time to time speculated in grain in the Milwaukee market, and also in the Chicago market, through the defendants, acting as their factors and commission men at that place. They were then in good financial circumstances, though with small capital; had a running account, and were in good credit and standing with S. D. Foss & Co. In October, 1874, the bankrupts ordered defendants, at different times, by telegraph, to make sales of grain for them upon the Chicago market for November delivery, amounting in the aggregate to seventy thousand bushels of corn, and five or ten thousand bushels of wheat. The defendants, upon receiving these orders, went upon the market in Chicago and executed them, by making, as was the custom, contracts, generally in writing, and in their own name, with different parties, for the sale of the grain for November delivery, in lots of five thousand, or multiples of five thousand bushels, and immediately and from time to time, notified bankrupts, by telegram and by letter, of what they had done, and their acts were fully ratified and approved by the bankrupts. No "margins" were required to be put up by C. B. Stevens & Co., as they had an account with defendants, and were accounted by them responsible.

At about the time or a little before these contracts matured, as they did on the last day of November, the defendants performed a part of them on the behalf of C. B. Stevens & Sons, by a purchase and actual delivery of the grain to the parties to whom the sales were made. The evidence shows that, as to twenty thousand bushels of corn, there was an actual delivery of the grain, and as to ten thousand more, a delivery of warehouse receipts for that amount. As to the balance of the grain contracted to be sold, the defendants went upon the market and purchased it of different parties and had it ready for delivery; and then finding other parties who had similar deals for November purchases and sales, formed rings, or temporary clearing houses, through which, by means of a system of mutual offsets and cancellations that had grown up on the board, the contracts were settled by an adjustment of differences, saving an actual delivery and change of possession. It so happened that there was a considerable rise in the market price of corn during the month of November; and it was found that, after these transactions were closed out, there had been a loss to C. B. Stevens & Sons of something over ten thousand dollars, and which the defendants, having paid in cash for them on the purchase of the grain, debited to their account, according to the previous course of dealing between the parties.

The notes and mortgage in suit were soon afterwards given by the bankrupts to secure a portion of these sums so advanced by the defendants for them, including also about three hundred and seventy-five dollars, charged by S. D. Foss & Co. as their commissions. Unsecured notes were also given for three thousand dollars, balance of the ten thousand three hundred and eighty-six dollars and sixty cents indebtedness, which were afterwards paid by C. B. Stevens & Sons.

Two years afterwards, on November 19th, 1876, C. B. Stevens & Sons filed their petition in bankruptcy in this court, and were on the same day adjudged bankrupts. The assignee in bankruptcy brings this suit to set aside the notes and mortgage, and in substance claims that C. B. Stevens & Sons, at the time the orders for the sale of grain were made and executed in October, 1874, had no corn to sell, and no expectation of having any, with which to fill these contracts. That these facts were known to both parties, that is to the bankrupts and to the defendants, S. D. Foss & Co., and that it was understood by and between them at the time, that no grain was in fact to be delivered by C. B. Stevens & Sons, but that the contracts were to be settled by the payment or receipt of differences, according as the market should rise or fall in the month of November, and that they were thus mere wagers upon the November market, and, as such, contrary to law, and void, and that the notes and mortgage confessedly given to secure cash advances made by defendants, as the factors of the bankrupts, and with their approval, to pay the losses sustained upon these sales, should be cancelled and delivered up.

The question is whether this should be done. The question is, of course, a mixed question of fact and law. But I regard it as more a question of fact than of law; and I cannot help thinking, in looking through the cases on the subject, that more confusion and discrepancy has crept into them, from a failure to determine precisely the facts, than from any essential difference of opinion upon the abstract propositions of law applicable to them. This seems to be notably the case in Rumsey v. Berry, 65 Me. 570, where, in the trial court, instead of submitting the question of fact as to what the contract really was, it not being in writing, to the jury, instructions were asked, that, as a matter of law, the contract was a wagering contract. This instruction was properly refused, but there was a total failure to fairly submit the question of fact to the jury. It is not to be wondered at, that on an appeal to the supreme court, the facts not being fairly determined, the opinion sustaining the transaction as legal should have been given by a divided court, four judges concurring in the decision of the court, one judge delivering a dissenting opinion, one judge concurring in the dissenting opinion, and still another judge "inclined to concur" in it. If there

had been an eighth judge, it might not be improbable that he would have been "inclined to concur" in both opinions. And all this simply because the facts themselves not having been determined, there was no tangible, well-defined question of law before the court.

The testimony in the case at bar is quite exhaustive and voluminous. It is confined, however, to a few points, and though somewhat conflicting, I have had no great difficulty in determining the facts to my satisfaction. It is proven that, at the time these contracts were made, C. B. Stevens & Sons had not the grain on hand at De Soto, where they purchased grain, or elsewhere, nor any expectation of having it, with which to fill the contracts.

Chas. B. Stevens, the active member of the bankrupt firm, testifies that at the time he telegraphed to defendants to purchase the corn, they had not a bushel on hand, and did not expect to have any to deliver on the orders; that they were not then dealing in corn at De Soto, or anywhere else, and never did except "scalping" in it at Chicago; that they had no agreement with defendants to ship corn to fill the orders, and that the understanding was that they were merely "scalping" or option deals, and were to be settled by paying or receiving the difference at the maturity of the contract, or before; that they never did deliver any corn on these sales; that defendants claimed that they bought in the options at different times and charged the difference to C. B. Stevens & Sons.

He says, also, that he had no conversation with defendants until after the transactions were closed up; that he then had a talk with both of them in relation to these deals; that it was on the board of trade at Chicago; that he asked M. H. Foss how they settled these options or "scalps," and if there was any wheat or corn delivered, and he said, no; that it was done generally by forming rings among members of the board, by clerks that they employed; that these clerks settled the deals between parties in the ring whom they may have sold to, or bought of, and by paying or receiving differences, as the case may be; that he thinks he asked him about the delivery of grain, and he said no grain ever passed. Witness says this was the kind of transaction he was operating in, as he understood it, and that no grain was to be delivered or received on these contracts, and that he understood them to be mere wagers on the future price of grain, and that defendants regarded them in the same light. That they continued this kind of deal with defendants until the fall of 1876.

On cross-examination he says, he commenced sending orders to defendants before he had any conversation with them; that it was a month after these transactions that he had the talk with them in Chicago; that de-

fendants were their agents and commission merchants in Chicago; that he understood that Foss & Co. were liable for the damages for the non-fulfillment of the contracts they made for C. B. Stevens & Sons, and that they expected to make good to them the losses which they might incur in their behalf; and that if defendants failed to comply with the contracts they made for the bankrupts they would be deprived of their privileges on the board of trade; that Foss and he never talked about their agreement with one another in respect to these transactions, and that their conversation only related to the general course of business on the board of trade; that he (witness) understands that all contracts where wheat is sold, and not actually delivered, are wagering or betting contracts; and that all option contracts are betting contracts. The other Stevenses testify substantially in the same way as to their understanding of the transaction, but not as to the conversation with defendants in Chicago. And this is the substance of the testimony for the complainant. The defendants positively deny the conversation testified to by C. B. Stevens. They swear (in substance) that they had no understanding about these contracts, different from what might be inferred from what appears on the face of the transaction itself; that they were executed in their usual course of business, in the same manner that all the business on the board of trade relating to option contracts for future delivery of grain is transacted; that instead of understanding that no wheat or corn was to be delivered, their understanding was just the contrary; that the grain must be delivered according to the terms of the contract in all cases; that there was no option in the matter except as to the day in November on which the delivery was to be made; that if not delivered before, it must at all events be delivered on the last day of the month; they did not know whether Stevens & Sons had the grain to ship from De Soto, and did not stop to inquire, but supposed they might have it; that if they did not ship it, they (Foss & Co.) were bound to deliver the grain for them; that the contracts, according to universal custom on the board of trade, were made in the name of S. D. Foss & Co.; the name of their customer not being disclosed to the other party, or even inquired after. They testify that they have never dealt in what are called "puts" and "calls," such as are described in Ex parte Young [Case No. 18,-145]; [In re Chandler, Id. 2,590],[3] and that such contracts, which give the option to deliver or receive, or not, are prohibited by the board of trade as well as by the laws of Illinois; that they made these contracts with various members of the board of trade, for and on behalf of the bankrupts, at their request, and for their benefit, in entire good faith, without any understanding that they

---

[3] [From 10 Chi. Leg. News, 211.]

were not to be performed, and that Stevens & Sons not shipping the grain, they performed their contracts by going upon the market and purchasing the wheat and corn; that as to thirty thousand bushels of corn they made a delivery, and as to the balance they closed out the deal in the manner before indicated, by mutual offset and adjustment of differences; that this adjustment of differences is a mere matter of convenience to the members of the board, and to their customers; that no person is under the least obligation to settle in that way, and that dealers may and often do insist upon an actual delivery of the grain, and that settlement frequently saves to their customers the cost of insurance and storage. That the object of forming these rings or clearing-houses, is to close out the transactions and get them off their books; and this is what they call "ringing it out." But that it frequently cannot be done in that way; as if, for any reason, one whose assistance is essential to complete the circle, prefers an actual delivery, in which case the ring is "burst;" and then each must perform his contract by actual delivery of the grain. Their testimony is full, and fair, and intelligent upon the questions at issue, and they are corroborated by several other witnesses, ex-presidents, ex-directors, ex-commissioners of appeals, and present members of the board of trade, and some of the persons with whom these contracts were made. The testimony is conclusive that this business was done much in the same manner that all the other business on the board of trade is done respecting contracts for the future delivery of grain. They all agree that there is no option except the option to deliver on any day of the month; and that the seller is bound, not only by the contract but by the rules of the board, to which it is made subject, to perform his contract by an actual delivery, unless excused from the performance by the act of the other party; and for a violation of this rule he is subject to the discipline of the board, and to be dismissed therefrom if he insists upon the violation of his contract.

Now, which party is best corroborated in their understanding of the contract by the admitted facts of the case?

It is clear to me, by all odds, that the defendants are best corroborated.

It is very easy for either party to swear to what his own understanding of the contract was, but that standing alone is manifestly immaterial. The secret intentions of one party contrary to what appears on the face of the contract, and not communicated to the other party, cannot prevail to make a contract illegal which is otherwise valid. The real question is, what was the contract? and that implies an inquiry as to the mutual understanding and meeting of the minds of the parties. What was that? It is easy for a party to swear what his own understanding and intentions were, but when he comes to swear to the intentions and understanding of the other party, the consideration due to his testimony stands on an entirely different footing. He may be presumed to know his own inten: ons, but the evidence of the intentions of the other party should not be of a merely subjective character, but should consist of tangible facts and circumstances outside of his own consciousness, and a knowledge of which would be capable of satisfying other minds.

The conversation with the defendants testified to by Stevens, besides being denied by them, if proven, is not very strong evidence, for Stevens admits that this was a month after these transactions occurred, and was a general conversation relating to the general manner of doing business upon the board, and not to the transactions in question. But aside from the testimony as to this conversation, what is there in the case to show that S. D. Foss & Co. had any intention in regard to these contracts different from what is fairly evidenced by the contracts and transactions themselves, as they appear upon their face? The telegrams were orders in writing, and gave positive directions to sell grain; not to sell a privilege to deliver or not. The evidence shows at the time they were made there had been no previous communications or understandings in regard to these purchases. When received, Foss & Co. went upon the market and executed the orders by making written contracts of which the following is a blank copy, or verbal contracts to the same effect:

"Grain Contract. Chicago,—1874. We have this day sold A. B. & Co. ten thousand bushels of No. 2. corn, in store, at —— cents per bushel, to be delivered at sellers' option during the month of November, 1874, —— in lots of 5,000 bushels each. This contract is subject, in all respects, to the rules and and regulations of the Board of Trade of the city of Chicago. M—at—cts. S. D. Foss & Co. Per ——."

When these contracts matured, the defendants performed them by a delivery of the grain, except when, by the mutual arrangement of the parties concerned, the contracts were taken up and cancelled, and then they invariably paid in cash the damages which the law would have obliged them to pay upon a failure to perform their agreement; that is to say, the difference between the contract price and the market price on the day when delivery should have been made.

Now, in the absence of more convincing testimony, what the parties actually did is pretty good evidence of what they intended to do; and I must conclude that upon the face of the transaction, as shown by the acts and conduct of the parties, the evidence is very strong that these sales were bona fide sales, and not made with any intent, mutual between the parties, to violate the law.

The notes and mortgages sought to be set aside (as well as the original contracts for

the sale of the grain, both as between the bankrupts and S. D. Foss & Co., and between S. D. Foss & Co. and the parties with whom they contracted), being in writing and perfectly fair on their face, and given for a full money consideration without any pretense of fraud or unfair dealing, the burden of making a clear case for setting them aside for illegality, lies with the complainant. There should be in his favor a clear preponderance in the weight of the evidence. Pixley v. Boynton, 79 Ill. 351. Contracts made and so deliberately entered into upon adequate consideration, without fraud, should not be set aside for light or transient reasons, or mere suspicion of being contrary to law. But instead of there being a preponderance of proofs in favor of the complainants, I am obliged to believe that the weight of evidence is the other way, and I must find as facts:

1. That C. B. Stevens & Sons, when they gave the orders for the sale of the grain, had no grain to deliver, no contracts made by which they expected to obtain it, and no expectation of ever having it delivered, by shipping it to the defendants.

They did expect and intend, however, that S. D. Foss & Co. would make these contracts much as they did, in fact, make them, and that they would, at their maturity, take care of them for C. B. Stevens & Sons in about the same manner they did take care of them, by a delivery of the grain, or by a settlement and adjustment of differences according to circumstances; and that whatever the profits were, they were to be credited with them, and if there were losses, such losses were to be borne by them.

2. That the defendants did not know that C. B. Stevens & Sons had not the grain, but had no reason to expect that they had or would obtain it to ship to Chicago in sufficient amounts to fill the orders, but intended that if C. B. S. & Sons did not ship the grain, they (defendants) would perform their contracts with the parties with whom they were severally made in C. B. Stevens & Sons' behalf, in good faith, by a delivery of the grain, unless delivery was dispensed with by the parties who had a right to insist upon a fulfillment of the contracts, and that there was no mutual understanding that the contracts were mere wagers on the price of grain for the November market, or that there was to be, in fact, no delivery, but only an adjustment of differences.

3. The understanding of the other parties to these contracts, to whom sales were made, as to their being performed, was the same as that of the defendants.

Having determined the facts, the law applicable to the case is not difficult.

1. The contracts sought to be set aside are written contracts, and the mortgage is under seal. Nevertheless, the weight of authority, and I think that of doctrine is, that you may go behind the writing and show what the real intent and meaning of the parties were; and if it appears that the writing does not express the real intent of the parties, but is merely colorable, and used as a cloak to cover a gambling transaction, the court will not lend its aid to enforce the contract, however fair on its face; or if securities are given, as in this case, will interfere on grounds of public policy and for the public good, rather than for the purpose of relieving a party who is himself particeps criminis in an inhibited transaction, to set aside such securities. In re Green [Case No. 5,751]. and the cases there cited.

2. A contract for the future delivery of personal property, which the seller has not got when the contract is made, nor any means of getting it, is not void for illegality.

That was held in Porter v. Viets [Id. 11,-291]. and is the settled law. See Logan v. Musick, 81 Ill. 415; Hibblewhite v. McMorine, 5 Mees. & W. 462.

The seller is bound by the contract to deliver the goods, and if he fails he must pay damages.

Such contracts, though entered into for pure purposes of speculation, however censurable when made by those engaged in ordinary mercantile pursuits, and who have creditors depending for the payment of their just claims upon their prudent management in business, are nevertheless not prohibited by law.

As said in Porter v. Viets, supra, "People might differ about the propriety of making such a contract by one who did not know certainly where he was to acquire the property, but, having made it, the courts will compel him to abide by it." That case was on demurrer, and was in many essential respects similar to the one at bar.

3. The substance of the contract itself is what must control. The secret intention of one of the parties uncommunicated to the other party, not to fulfill his contract, is not enough to make the transaction illegal. The intent that it should be a mere betting upon the market, without any expectation of actual performance, must be mutual, and constitute an integral part of the real contract, in order to vitiate it.

Furthermore, supposing it had been the mutual intention of S. D. Foss & Co. and the bankrupts, that these contracts were not to be performed, I do not see that that would make them illegal, so long as the other parties to the contract did not participate in that illegal intention. S. D. Foss & Co., and C. B. Stevens & Sons did not constitute the parties to the contract. There was no contract for the sale and delivery of grain made between them. As between them the relation existed of principal and agent. S. D. Foss & Co. made the contract in their own name, but for, and in behalf of C. B. Stevens & Sons; and S. D. Foss & Co. and C. B. Stevens & Sons constitute but one party to the contract, whether it be considered as a contract between S. D. Foss & Co. and the parties in

Chicago, with whom they dealt, or as a contract between C. B. Stevens & Sons and those same parties; and there is no evidence, whatever, to show that those other parties had any notice or knowledge of this gambling intent. On the contrary, they knew that Foss & Co., as the evidence shows, and some of these same parties testify, were men of high standing and responsibility on the board of trade, and would perform their agreements. Lehman v. Strassberger [Case No. 8,216], and Wolcott v. Heath, 78 Ill. 433, are directly in point.

4. If the original contracts for the sale of grain were. liable to the taint of illegality, as charged, it does not necessarily follow that the notes and mortgage executed by one of the principals in the transaction, to secure the payment of moneys previously advanced by their agent to pay losses springing out of, and resulting from those original transactions, are contaminated with the same vice.

This question is fairly presented by this record, though the decision of the point is not necessary to the case, and I do not care to decide it. I shall, therefore, content myself with reference to some few high authorities, which hold such a contract valid. The leading English case, decided by Lord Mansfield, is Faikney v. Reynous, 4 Burrows, 2069. Following this are Petrie v. Hannay, 3 Term R. 418; Farmer v. Russell, 1 Bos. & P. 296.

The first case cited is a strong case, and though seemingly questioned by Lord Kenyon in Petrie v. Hannay, supra, has never been overruled, I believe, in England. Marshall, C. J., cites it approvingly in Armstrong v. Toler, 11 Wheat. [24 U. S.] 258. See, also, Owen v. Davis, 1 Bailey, 315, and the recent case before cited of Lehman v. Strassberger [supra], which is very much in point, I think. This, I believe, is undoubtedly the result of the English cases. How far the rule has been changed by statute, or by decisions in the several states, I do not care to inquire.

5. Whatever might be the judgment of discreet men as to the propriety of such purely speculative transactions as are disclosed by this record, undertaken by men in mercantile pursuits, I am unable to see, on general principles, any objection to them in point of law. The law does not undertake to prevent speculation. It does not undertake the Quixotic task of nicely governing men in all the relations of life, and compelling them to do, under all circumstances, what is prudent and reasonable. The truth is, men are speculative creatures as certainly as they are eating and sleeping ones. And, although it is undoubtedly true that much harm comes to the community from over speculation, it is more than doubtful if the world would be better off without speculators; or, if it would be. that the law can do much in the way of abolishing them.

As a common thing, business men are prone to regard their own judgment of the market as a part of their capital, and to a certain extent they have a right so to do. It is only with the more manifest abuses of the privileges of citizens in their dealings with one another, and when the evil touches and infects the public welfare, that the law assumes to interfere. In the main, commercial transactions must be left to be regulated by the higher and more inexorable laws which govern the trading world. If the transactions disclosed by this case are illegal, then, undoubtedly, a great part of the banking and clearing-house transactions in our great commercial centres are illegal also.

I am persuaded that to hold them so would be trenching too severely upon the business of the commercial world, without any corresponding benefit to be expected from it.

It might be a difficult task to lay down any single rule or draw a straight line which should define or divide all merely speculative from all pure gambling transactions, for it must be admitted that the same prime element of risk is common to both. But it has seemed to me that, according to any reasonable rule which it would be practicable to enforce, these transactions must fall on the side of legal speculations. They were carried on in good faith, and in the usual and ordinary course of business, upon the board of trade, which it seems undertakes to exercise a salutary control over its members; it appearing in evidence that if any member fails or refuses to perform his contract by delivery or receiving grain which he has agreed to deliver or receive, he is subject to the discipline of that body; and if the offending member is still refractory or contumacious, he is suspended or finally dismissed from the board; thus adding to the penalties which the law attaches to a violation of contracts, the sanction of a wholesome family discipline. The witnesses agree that what are called "puts" and "calls" are not allowed to members of the board, and that "scalpers" cannot live in that atmosphere, they bearing the same relation to that fraternity of commercial gentlemen that shysters do to full-bred lawyers. If that be so, certainly they are far enough asunder.

Then again, if we look at the equities of this case, aside from the special head of equity, under which the court, in the interest of the public good, will interfere to set aside and cancel securities given upon a gambling consideration, the general equities and intrinsic justice of the case are largely with the defendants. The whole business was originated and carried on at the instance and for the benefit of the bankrupts. Whatever of legal turpitude attaches to these transactions, it is evident that C. B. Stevens & Sons were not merely particeps criminis, but the principal offenders. When profits ensued. as they frequently did, they put them down in their own pockets. On one occasion it is in evidence that they represented to defendants that they made quite large amounts, something like ten thousand dollars out of these

deals. Why then, if it was their deal, and they enjoyed the profits when there were profits, should they not bear the losses when the market turned against them and these fell to their lot, and not shuffle them off upon their agents who, it is not denied, had acted fairly and honorably with them?

Foss & Co. had no interest in these transactions, except their commissions, and instead of leading the bankrupts on in this business, the evidence of the bankrupts is that they discouraged them on every occasion. Their letters, introduced in evidence by the complainant, show that S. D. Foss & Co., from time to time, dissuaded the bankrupts from these speculating deals—told them they were taking too much risk, both in respect to wheat and corn; that there was a small stock of old corn in the market; that the new crop had not yet been moved; that there was danger of a "corner" being run, and sending prices up, and on one occasion protested that if they insisted upon taking such risks, they must employ other commission men. These letters were relied upon to show that the defendants understood these deals to be gambling transactions; but to my mind they simply show a proper appreciation, on the part of the defendants, of the risks which men, in the circumstances and business of the bankrupts, were taking on themselves, and a due consideration for the interests of their principals in that behalf. But C. B. Stevens & Sons, relying confidently on their own judgment and sources of knowledge, as men are inclined to do, continued the business until the tide turned against them. Under these circumstances, one would say that the commonest kind of honesty that passes current among men should require C. B. Stevens & Sons to pay these losses, and not shift them off upon their factors. Of course the assignee stands, as far as legal right goes, in no better case than the bankrupts; and it is due to the bankrupts to say that, as far as they are personally concerned, they have never objected to the payment of these claims, though they are now the main witnesses for the complainant, and in their testimony say they want him to succeed. The assignee, of course, in the interest of the creditors, has only done his duty in bringing these matters before the court for adjudication.

I have not undertaken to review the decisions upon this subject. I have not thought it essential. Those of the highest tribunal in Illinois, though not perhaps entirely reconcilable, I think are so in the main, and go to support the transaction disclosed by the case at bar. Whatever discrepancy there is, as I have before remarked, arises more from the facts than from the law. The most that can be said is, that different courts have come to different conclusions upon different states of facts. This cannot be wondered at, and is unavoidable. How far the judgment of the court, in a given case upon the facts, may be influenced by its opinion of the law

and the essential justice of the case, cannot always be known. I confess I have a strong predilection in favor of holding men of full age and right mind to their contracts deliberately entered into upon full and adequate money considerations, without deceit or imposition, and when the consequences of their contracts, however ill-advised, are mainly personal to themselves.

I think the cases cited of Wolcott v. Heath, 78 Ill. 433, Pixley v. Boynton, 79 Ill. 351, and Logan v. Musick, 81 Ill. 416, express the law of that state on the subject, and are authorities in the case at bar.

The case of Lyon v. Culbertson, 83 Ill. 33, in which Justice Dickey delivers a rigorous dissenting opinion, I am told was decided before the cases in the 79th and 81st Illinois Reports. However that may be, and whether the decision be good law or not, I do not see that it is necessarily at variance with the other cases, nor that it attempts to overrule or qualify them in the least. That seemed to turn on a question that is not presented in this case.

There is no failure to perform, or of offer to perform, on the part of S. D. Foss & Co., on any of the contracts which they made; nor anything in the contracts dispensing with an offer to perform.

Again, it must be incontestible, that if the contracts were valid in their inception, and not tainted with any gambling intent or device, a subsequent mutual settlement by the parties, which took the place of actual performance, cannot have the retroactive effect of making them void for illegality. If the contracts were void at all, they must have been void when made. The subsequent conduct of the parties may, and should be considered as evidence tending to show what the real contracts were when entered into; but, if they were originally valid, no subsequent act of the parties can have the effect to render them obnoxious to the taint of illegality as being gambling contracts.

I have not overlooked the case of In re Green, supra, decided by my learned and lamented predecessor.

I have not had occasion to review the evidence from which the conclusions of fact in that case were drawn; and it is enough to say that upon the findings of fact made, the law is undoubtedly correctly stated.

Bill dismissed.

[NOTE. It is stated by Dyer, District Judge, in Ward v. Vosburgh, 31 Fed. 15, that an appeal was taken from the judgment herein to the circuit court, and that in an oral opinion delivered by Drummond, Circuit Judge, the contracts involved in the foregoing case were sustained, and the decision of the district court affirmed.]