## No. 9548.

### CONNER & HARE VS. GEORGE M. ROBERTSON.

1. Sales of property for future delivery, with the *bona fide* intention and obligation to make actual delivery, are lawful contracts; but if, under the form of such a contract, the real intent be merely to speculate on the rise or fall of prices, and the goods are not to be delivered, but the contract to be settled on the basis of differences of price, the transaction is a wager and is non-actionable.

2. But in order to affect the contract, the alleged illegal intent must have been mutual, and such intent in one party, not concurred in by the other will not avail.

3. The law presumes lawful purpose until the contrary is proved; and when one party charges illegal intent, the burden of proof is imposed upon him.

4. The validity of the contract depends upon the state of things existing at its date, and is not affected by subsequent agreements under which the parties voluntarily assent to a settlement on the basis of differences.

5. The mere fact that at the date of his contract, the vendor had not the goods, and had made no arrangement for obtaining them and had no expectation of receiving them unless by subsequent purchase, does not suffice to impair the contract. The contrary doctrine, once announced, is now thoroughly overruled.

6. It follows that the failure to identify the particular goods sold does not affect the matter, because the sale is not of ascertained articles, but of articles of a designated kind and quantity to be selected thereafter, which is a lawful contract, when the obligations are reciprocal.

Applying the foregoing principles to the facts of this case, which is a contract for the future · delivery of cotton under the rules of the Cotton Exchange of New Orleans, the defense of wagering is not sustained.

APPEAL from the Twenty-first District Court, Parish of Opelousas. Gales, J.

R. S. Perry, for Plaintiffs and Appellants.

Breaux & Renoudet, for Defendant and Appellee.

The opinion of the Court was delivered by

FENNER, J. This case involves the legality of transactions in the · purchase and sale of cotton for future delivery, conducted under the rules of the Cotton Exchange of New Orleans, and the right of brokers, who act as agents in effecting such transactions, to recover from their principals commissions for their services and losses paid by them in the execution of their mandate for account of said principals.

The New Orleans Cotton Exchange is a corporation chartered in ac-·cordance with the laws of the State. Its membership comprises the leading merchants engaged in all the ramifications of the vast cotton trade of the city. It conducts its business in the most splendid build-ing of the metropolis, situated upon one of its important public thoroughfares. Amongst its purposes, as declared in its charter, are the following: "To establish just and equitable principles, uniform usages, rules and regulations, and standards for classification, which shall govern all transactions connected with the cotton trade; to ac-·quire, preserve, and disseminate information connected therewith; to decrease the risk incident thereto, and generally to promote the inter-ests of the trade, and to increase the facilities and the amount of the cotton business in the city of New Orleans."

In execution of these purposes, the Exchange has adopted an elabor-ate system of "Rules governing contracts for the future delivery of cotton."

These Rules recognize no contracts except for the sale and purchase of cotton to be actually delivered and received at the future period stipulated. They impose upon the seller the absolute obligation to deliver, and on the buyer the absolute obligation to receive the cotton with the single self-evident and superfluous qualification, "that any party holding a contract against another, corresponding in all respects,.

except as to price, with one held by the other against him, may close or cancel both by giving notice in writing to the opposite party at any time before notice of delivery," which is an obvious application of the principles of set-off or compensation.

The Rules explicitly discountenance and forbid any contracts dispensing with the obligation of actual delivery, and providing for a mere settlement of differences in price, declaring: "All contracts for the future delivery of cotton shall be binding upon members, and of full force and effect until the quantity and qualities of cotton specified in such contracts shall have been delivered and the price specified in said contract shall have been paid. Nor shall any contract be entered into with any stipulation or understanding between parties at the time of making such contract, that the terms of said contract, as specified in Rule 1, are not to be fulfilled, and the cotton received and delivered in accordance with said rule."

These Rules are, by their own terms and by the terms of the contracts entered into under them, written into the contracts and form as much part of the agreement of the parties as the stipulated price or quantity of the cotton.

They are published for the information not only of members but of outsiders dealing through them, are accessible to all, are referred to in the contracts, and no person dealing thereunder can be allowed to plead ignorance of them.

The facts exhibited in this particular case are the following :

Plaintiffs are members of the Cotton Exchange doing business as Brokers in contracts for future delivery of cotton. They received an order from defendant's brother to sell, for defendant's account, one thousand bales of cotton for delivery in September, 1882. They executed the order by entering into a contract conforming in all respects to the rules of the Exchange, for the sale of one thousand bales deliverable in September, in accordance with said rules, at the price of 11 78-100 cents per pound. Defendant was duly notified of the sale and fully ratified it.

Under the rules, plaintiffs were the guarantors of the contract made for defendant, and were bound to execute it, whether he provided them with the cotton or not.

The price of cotton rose and defendant was called upon to face a loss. He did not comply with the contract made in his behalf nor take any steps to do so. The 23th day of September arrived and his agents were confronted with the necessity of providing for the execution of

their obligations under the contract on the following day. They, therefore, purchased from a member of the Exchange transferrable orders or contracts for the delivery of one thousand bales of cotton due on the following day. They paid for these the market price of the day. They then called upon the holders of the original contract which they had made in behalf of defendant, and effected a settlement with them by which the latter accepted the transferrable orders just purchased and surrendered the contract made for defendant. The difference between the price at which they sold and the price at which they repurchased was fifty-seven hundred and forty 77-100 dollars, which they paid out of their own pockets for account of their principal.

Defendant was immediately furnished with a statement of the transaction showing the amount due by him to plaintiffs on account of his loss and commissions.

He made no objections to the account or to the contract of his agents. His commission merchants in the city made sundry partial payments with his full approval. He sought the assistance of his father to enable him to settle the account which was denied. He finally said that he was broke and could not pay, and then this suit was brought. He now sets up a two-fold defense, viz: First, that plaintiffs were not authorized to make the transaction for him. Second, that the transaction itself was a wagering contract, a mere gambling transaction, affording no basis for a judicial action.

Defendant's own testimony is sufficient to show that he should have spared his conscience the strain of making the first defense, and it needs no further notice.

The questions arising under the second branch of the defense are, in great measure new to this court, but they have been often considered and determined by the courts of England and of the United States. We think there is no substantial difference, at least affecting this case, between the law of Louisiana and the existing law of England and of the other States of the Union on the subject of aleatory or wagering contracts.

We have no concern with the general definitions and provisions of our code on the subject of aleatory contracts. The only question here is whether this is a *non-actionable* aleatory contract, and the only provision of our law affecting *this* question is Article 2983 of the Civil Code, which provides: "The law grants no action for what has been won at gaming or by a bet, except for games to promote skill in the use of arms, such as the exercise of the gun, and foot, horse and chariot racing."

It follows that the only question affecting plaintiff's right of action is whether the cause on which it rests was, in form or substance, "gaming" or a "bet."

This is the precise question which arises under the English statute (8 and 9 Victoria, C. 109, Sec. 18), which in effect declares all contracts by way of gaming and wagering null and void, and renders actions for the recovery of money won on any wager unsustainable. A like rule doubtless prevails generally among the States of this Union.

This is sufficient to show that the decisions of the English and other American Courts as to what constitutes "gaming," or "a bet," or a "wagering contract," are entitled to full considerations as pertinent authorities.

These decisions are numerous and they exhibit quite a *consensus* of opinion on the following governing principles, which we accept and announce with our own full approval.

1. It makes no difference that a bet or a wager is made to assume the form of a contract. Gambling is none the less such because it is carried on in the form or guise of legitimate trade; and if, under the guise of such a contract, the real intent be merely to speculate in the rise or fall of prices, and the goods are not to be delivered, but one party is to pay to the other the difference between the contract price and the market price of the goods at the date fixed for executing the contract, then the whole transaction constitutes nothing more than a wager, and is non-actionable. Irwin vs. Willar, 110 U. S. 499; Benjamin on Sales, (Bennett's 3d Am. Edition) § 542, and numerous authorities there cited.

2. In order to affect the contract, the alleged illegal intent must have been mutual, and the intent of one party, not communicated to or concurred in by the other, will not avail. Grizewood vs. Blanc, 11 C. B. 536; Ashton vs. Dakin, 4 Hurlst & Nor. 867; Knight vs. Cambers, 15 C. B. 562; Cassard vs. Hinman, 1 Bosn. 207. 6 Bosn. 8; Kingsbury vs. Kirman, N. Y.; Smith vs. Bouvier, 70 Penn. St. 325; Rumsey vs. Berry, 65 Me. 570; Pixley vs. Boynton, 79 Ill. 351; Clark vs. Foss, 7 Biss. 540; Williams vs. Tiedeman, 6 Mo. App. 269; Sawyer vs. Taggart, 14 Bush. 729.

3. The law presumes that the true intention of parties is that which is expressed upon the face of their contracts, and also that men, in their business transactions, do not intend to violate the law or to make contracts for the enforcement of which the law refuses a remedy. Hence, when one party charges that the contract is infected with an illegal intent, the burden of proof is imposed upon him to establish

this allegation. Irwin vs. Williar, 110 U. S. 499 ; Frost vs. Clarkson, 7 Cowen, 24 ; Dykers vs. Townsend, 24 N. Y. 57 ; Pixley vs. Boynton, 79 Ill. 351 ; Williams vs. Tiedeman, 6 Mo. App. 269 ; Rumsey vs. Berry, 65 Me. 570.

4. The validity of the contract depends upon the state of things existing at its date, and is not affected by subsequent agreements under which the parties voluntarily assent to a settlement on the basis of differences in price. Parties to such contracts have the same liberty to settle their transactions by common consent according to their own discretion, which is accorded to parties to other contracts. Clark vs. Foss, 7 Biss. 540 ; Williams vs. Tiedeman, 6 Mo. App. 269 ; Sawyer vs. Taggart, 14 Bush. 729 ; Fareira vs. Gobele, ( Penn. ) 20 Alb. L. J. 48.

5. The law is now perfectly settled that an executory contract for the sale of goods for future delivery is not infected with the quality of a wager by reason of the fact that, at its date, the vendor had not the goods, and had not entered into any arrangement to provide them, and had no expectation of receiving them unless by subsequently going into the market and buying them.

The contrary doctrine announced by Lord Tenterden in Larymer vs. Smith, 1st B. & C. 1, and Bryan vs. Lewis, R. & M. 386, has been distinctly and repeatedly overruled and now ranks as an 'utterly exploded legal heresy. Benjamin on Sales, §§ 541, 542, 82, 83; Hibblewhite vs. McMorine, 5 M. & W. 462; Mortimer vs. McCallan, 6 M. & W. 58; Irwin vs. Williar, 110 U. S. 499, and nearly every case heretofore cited.

6. It follows, necessarily, from the foregoing that the failure to identify the particular goods sold does not affect the matter, because, from the very nature of the contract, the sale is not of ascertained articles but of articles of a designated kind and quantity to be selected hereafter, and is discharged by the delivery of articles answering to the general description given in the contract. Sawyer vs. Taggart, 14 Bush. 729.

Applying the foregoing principles to the facts of this case, the defense absolutely fails at every point. The contract assailed imports, upon its face, an absolute obligation on the vendors to deliver, and on the purchasers to receive, the cotton sold. All the evidence concurs in establishing that such were the absolute and actual obligations of the contract.

Not a line of evidence, direct or circumstantial, connects either plaintiffs or their vendees with any agreement, understanding or intention, express or implied, annulling or impairing these obligations.

The circumstances relied on by defendant—that *he* never intended or expected to deliver any cotton; that he had no cotton to deliver, to the knowledge of the plaintiffs, and had no expectation of having any; that no particular bales of cotton were sold, but only so many indefinite bales of a fixed weight and quantity, and others of like character —all prove, under the principles above announced, to be insignificant and of no avail to impair the rights of plaintiffs.

Defendant's objection that plaintiffs did not execute the contract by the actual delivery of cotton, and that he is not bound by the settlement made without his assent, has no force.

Plaintiffs delivered to their vendees what the latter were willing to accept as the equivalent of the cotton, to wit: transferable orders from responsible parties for the same amount and quality of cotton at the same time. They bought and paid for these orders, and they could not have bought and delivered the actual cotton at a less price or with less loss to the defendant. What ground of complaint has defendant? Plaintiff carried his contract to the very eve of its maturity, and only when it was evident that he had no intention of providing them with the means either to execute or settle it, and that they would be compelled, under their own obligations, to settle it themselves, did they make the settlement complained of. It was a substantial execution of the contract, but, had it been otherwise, plaintiffs, left to protect themselves by the unwarrantable default of defendant, might have claimed the right to discharge their obligations in the way most convenient to themselves and to hold defendant responsible for the loss incurred, provided, at least, that loss was not increased by the mode of settlement adopted. The case of Irwin vs. Williar, 110 U. S., 499, needs only to be read in order to show that it contains nothing antagonistic to the foregoing.

The defense in this case is thus fully disposed of.

The course of dealing in futures on the Cotton Exchange, so far as involved here, is not violative of the existing law. On the contrary, the framers of its rules have exhibited the greatest care and skill in conforming them to the law and jurisprudence. If it is attended with evils hostile to the general welfare, remedy must be sought in future legislation. From the publicity and notoriety of the course of these transactions, it must be inferred that the legislative branch of the government has not seen the necessity of interfering with them.

Even had the legality of the contract here been successfully impeached, the defendant would still have had to meet the serious

question whether the plaintiffs, as mere brokers or agents of defendant, might not have recovered, under their contract of agency, their commissions and what they had paid for account of defendant, irrespective of the validity of the contract between the buyer and seller. On this point we express no opinion, only referring to the following authorities for information. Petrie vs. Hannay, 3 Ten., 418; Failhney vs. Raynous, 4 Burr; Planters' Bk. vs. Union Bk., 16 Wall., 500; Knight vs. Cambers, 80 E. C. L., 561; Hacker vs. Hardy, 4 L. R. Q. B., 685; Durant vs. Barthe, 98 Mass., 168; Lehmann vs. Strassburger, 2 Woods, 554.

We desire to acknowledge the assistance afforded us in the examination of these questions, not only by the learned briefs in the case, but by the able *brochure* of Julius Aroni, Esq., of the New Orleans Bar, entitled "Futures."

It is, therefore, ordered, adjudged and decreed that the judgment appealed from be annulled, avoided and reversed; and it is now ordered, adjudged and decreed that there be judgment in favor of plaintiffs condemning the defendant to pay to them the sum of four thousand two hundred and fifty-two dollars, with legal interest from December 15, 1883, and all costs in both courts.