148 So. 703

## STEWART BROS. v. BEESON.

No. 31519.

May 29, 1933.

Polk & Robinson, of Alexandria, for appellant.

Thompson & Ferguson, of Leesville, and Cline, Plauche & Thompson, of Lake Charles, for appellee.

ODOM, Justice.

Plaintiff is an ordinary partnership with its domicile and chief place of business in New Orleans, and has a branch in Alexandria. It is a member of the New Orleans Cotton Exchange and the Chicago Board of Trade. It is engaged in the brokerage business and acts as agent for its clients in the purchase and sale of cotton and grain for future delivery, charging a commission on each transaction for its services.

Defendant is a farmer residing in a small village in the parish of Vernon, where he operates a cotton gin. During the years 1928, 1929, and part of 1930, he was constantly "dealing in futures" with plaintiff as his broker or agent. His dealings with plaintiff involved eighty-three transactions, some profitable and others unprofitable to him. As a net result of all these transactions, he found himself indebted unto plaintiff in the sum of $3,158.74, which he refused to pay and this suit followed.

This appeal is from a judgment rejecting plaintiff's demands and dismissing its suit.

1. As a cause of action, plaintiff sets out the above-stated facts with reference to its line of business and its connection with the New Orleans Cotton Exchange and the Chicago Board of Trade; that defendant employed it as broker or agent for the purchase and sale of cotton and grain for future delivery under verbal instructions to N. L. Gunn and W. L. Creekmore, who were in charge of its Alexandria branch; that defendant's instructions to these agents were to make the purchases or sales of agricultural commodities on the floors of these exchanges, subject to the rules and regulations governing such contracts and the regulations of the Department of Agriculture of the United States; that all transactions had with defendant contemplated the honest, bona fide actual delivery of such commodities as were sold and the acceptance or receipt of such as were purchased; and that all contracts made were intended to bind the parties accordingly.

Defendant made a feeble but wholly unsuccessful attack upon the account sued on, mainly on the ground that he did not authorize plaintiff to enter into some of these transactions and that he gave the plaintiff no written authorization for any of them.

We pass this phase of the case with no further comment than to say that the verity of the account is proved beyond question. Defendant did not give plaintiff written authorization to make the contracts for him. He did not need to do that. A mandate may be verbal. C. C. art. 2992.

Defendant's main defense to this action is, to quote from the brief filed by his able counsel, as follows:

"The main defense in this case is levelled at the proposition that the transactions out of which the alleged indebtedness grew, were 'dealings in futures' of agricultural products, cotton and wheat, when neither party to the transaction intended that the actual commodity should be actually delivered or received, but intended that such transaction would be settled merely upon the difference between the market or exchange quoted price at which the transaction was entered and the price as quoted on the exchange, at the time the transaction was closed. In other words, nothing but bets when defendant 'bought' that the market would go up and when he 'sold' that it would go down. This, we believe, the evidence amply and unmistakably establishes."

In sum, the defense is that all these transactions were mere wagers or bets, and he invokes the rule that, "The law grants no action for the payment of what has been won at gaming or by a bet, except for games tending to promote skill in the use of arms, such as the exercise of the gun and foot, horse and chariot racing" (C. C. art. 2983), and also Act No. 16 of 1898, which provides that:

"It shall be unlawful for any person to deal or gamble in futures on agricultural products or articles of necessity, where the intention of the parties is not to make an honest and bona fide delivery of said agricultural products or articles of necessity."

Act No. 16 of 1898 was passed at the first regular session of the Legislature after the adoption of the Constitution of 1898, which, like the Constitution of 1913, said:

"The pernicious practice of dealing or gambling in futures on agricultural products or articles of necessity, where the intention of the parties is not to make an honest and bona fide delivery, is declared to be against public policy; and the General Assembly shall pass laws to suppress it." Art. 189.

The identical provision is found in section 8, art. 19, of the Constitution of 1921.

2. The rule which prevails here and elsewhere, and which has been affirmed and reaffirmed by this court, by the courts in practically all other jurisdictions as well as the federal courts, is that wagering contracts are null and void and that actions for the recovery of money won on wagers is unsustainable. The only exception seems to be that contained in our own Code (article 2983) with reference to wagers on games tending to promote skill.

It is true also that a broker who acts as agent for another to obtain wagering contracts is not permitted to recover for his services in procuring such contracts. It follows therefore necessarily that if the transactions out of which this litigation arose involved wagering contracts, plaintiff cannot maintain its suit. Whether they were or were not such contracts is the issue here involved.

3. The law relating to contracts of the kind here involved has been stated over and over again by text-writers and the courts, but never more fully, concisely, and accurately than by Justice Fenner in the case of Conner & Hare v. Robertson, 37 La. Ann. 814, 55 Am. Rep. 521, a case decided in 1885. In support of his statement of the law, Justice

Fenner cited the text-writers and the leading cases up to that time. The statements in later texts and decisions are in accord, if not identical, with that formulated by him. We quote with approval, as the law applicable to this case, that statement, omitting for the sake of brevity the authorities cited:

"1. It makes no difference that a bet or a wager is made to assume the form of a contract. Gambling is none the less such because it is carried on in the form or guise of legitimate trade; and if, under the guise of such a contract, the real intent be merely to speculate in the rise or fall of prices, and the goods are not to be delivered, but one party is to pay to the other the difference between the contract price and the market price of the goods at the date fixed for executing the contract, then the whole transaction constitutes nothing more than a wager, and is non-actionable. * * *

"2. In order to affect the contract, the alleged illegal intent must have been mutual, and the intent of one party, not communicated to or concurred in by the other, will not avail. * * *

"3. The law presumes that the true intention of parties is that which is expressed upon the face of their contracts, and also that men, in their business transactions, do not intend to violate the law or to make contracts for the enforcement of which the law refuses a remedy. Hence, when one party charges that the contract is infected with an illegal intent, the burden of proof is imposed upon him to establish this allegation. * * *

"4. The validity of the contract depends upon the state of things existing at its date, and is not affected by subsequent agreements under which the parties voluntarily assent to a settlement on the basis of differences in price. Parties to such contracts have the same liberty to settle their transactions by common consent according to their own discretion, which is accorded to parties to other contracts. * * *

"5. The law is now perfectly settled that an executory contract for the sale of goods for future delivery is not infected with the quality of a wager by reason of the fact that, at its date, the vendor had not the goods, and had not entered into any arrangement to provide them, and had no expectation of receiving them unless by subsequently going into the market and buying them. * * *

"6. It follows, necessarily, from the foregoing that the failure to identify the particular goods sold does not affect the matter, because, from the very nature of the contract, the sale is not of ascertained articles but of articles of a designated kind and quantity to be selected hereafter, and is discharged by the delivery of articles answering to the general description given in the contract."

As additional references, we cite the following:

6 R. C. L., under the general heading "Contracts," §§ 185 to 189, inclusive, pp. 780 to 785, inclusive, and the cases cited.

27 C. J., under the general heading "Gaming," subheading "Speculative Contracts," §§ 271 et seq., p. 1053 et seq.

20 Cyc., under the general heading "Gaming," p. 926 et seq.

See, also, the annotation in 79 A. L. R., beginning on page 592 and the case of Cisler

v. Ray, 213 Cal. 620, 2 P.(2d) 987, 79 A. L. R. 584.

It would be a useless expenditure of time, labor, and space to cite the various cases. They are all cited in the above authorities and in the case note in 79 A. L. R. 592.

■ 4. Applying the facts in this case to the law, our conclusion is and we hold that defendant is bound. He deliberately went into the future market, traded for more than two years, and lost. He must pay. He admits with commendable frankness that during 1928, 1929, and a part of 1930, he "engaged in deals and transactions on the cotton exchange," that he "played the cotton market" and the "wheat market," through plaintiff as his broker or agent. He was asked by his counsel to state through whom he had conducted these transactions, and he said through Mr. Gunn and Mr. Creekmore representing Stewart Brothers. He said he had lost in all probably $25,000.

Asked what he had offered to do in satisfaction of this debt, he said:

"I told him (Mr. Creekmore) I was awfully sorry about it, but I had told him before that I had stood all the loss I could stand in the market; it had been reversed on me every time since I had been dealing with it. And I said 'you ought to have protected me and not let those contracts run me in the hole, as you see you have. I have got no money to give you. Absolutely, I have lost all I have got. I hate to see you and Mr. Gunn get into trouble with the firm, but I don't figure it's my fault. I haven't got anything but some land, or something like that, but to help you out, I will deed you over some land I have got I'm not using.' "

From this it is plain that originally defendant did not deny the indebtedness. His subsequent repudiation of it on the ground that it arose over gaming or gambling contracts seems to have been an afterthought.

He does not deny, but frankly admits, that he authorized the transactions. He was asked what he said to Gunn and Creekmore, who were in charge of plaintiff's Alexandria office, when he wanted to enter the cotton market, and he said:

"Well, if I wanted to figure October cotton market I would say 'buy me so much October at the market'; if I wanted to sell an October, I would say, 'sell me in October', or January, or whatever the month might be. I just told them to buy or sell me one at the market."

All of defendant's dealings took place through the Alexandria branch of plaintiff's office. When he gave an order to buy or sell, the order was sent by wire to the main office of plaintiff in New Orleans, where the contracts to purchase or sell were consummated according to the rules of the exchanges. Immediately following the making of these contracts, defendant was notified by mail on a regular form addressed to him stipulating the commodity bought or sold, at the bottom of which is printed the following:

"It is agreed and understood between both parties that this contract is subject, in all respects, to the rules and customs of Exchange where order is executed, and subject to the Acts of the U. S. Department of Agriculture. The Contract contemplates the actual delivery or receiving of the commodity stated and we reserve the right to substi-

tute other contracts, where C. H. settlements have been made.

"It is further understood that on all marginal business, the right is reserved to close transactions *when margins are running out*, without further notice, and to settle contracts in accordance with the rules and customs of Exchange where order is executed."

Admittedly there were 83 of these transactions. Plaintiff's testimony is to the effect that notice in the above form was sent to defendant in each case and he does not deny that he received them. Defendant was asked whether, when he authorized these contracts, he contemplated actual delivery of the commodities, and he said he did not, that he was merely "speculating on the market" and "I had no thought of taking the actual commodities; in fact I don't knew there was any actual wheat or cotton involved. It was merely a matter of speculation. I assumed I purchased the contract. I played the market. When the market was long, I beat when it went up; and if it was short and the market went down, why I lost."

This is his whole defense. But it cannot avail him for several reasons.

One is that the written notices received by him of each of the transactions conveyed specific notice that the contracts contemplated actual delivery of the commodity dealt with and that they were subject in all respects "to the rules and customs of the exchange where order is executed." According to the testimony adduced by plaintiff, the rules not only contemplate but require actual delivery of the commodity.

Defendant says that he was not familiar with these rules. His ignorance of them does not excuse him. He was informed that there were rules governing such transactions which rules were available. If he failed to familiarize himself with them, that was his misfortune and not the fault of plaintiff.

"As a general rule, subject to certain limitations, a customer who engages a broker to execute an order on a stock produce exchange confers authority on such broker to conduct the transaction according to the rules and established customs of the exchange on which he deals, and the customer is thereby bound by such rules and customs even though he does not have actual knowledge of them."

The limitations of the general rule above stated are such as "vary or contradict the contract between the customer and his broker, or change the legal relations of the parties."

See annotation 79 A. L. R. 592, supra.

Again, defendant cannot escape the consequences of these transactions, even though he did not intend to make actual delivery of the commodities, it being shown beyond question that plaintiff did contemplate and intend actual delivery, and in fact under one of the transactions, that involving the purchase of 20,000 bushels of wheat, delivery was actually made at Chicago and the wheat sold for defendant's account. Justice Fenner said in the case of Conner & Hare v. Robertson, supra, that: "In order to affect the contract, the alleged illegal intent must have been mutual, and the intent of one party not communicated to or concurred in by the other, will not avail," and, "If one of the parties intends an actual purchase and sale, the contract as to him will not be af-

fected by an illegal intent or purpose of the other not communicated or concurred in." 6 R. C. L. § 188, p. 738.

While defendant says he did not intend or contemplate actual delivery of these commodities, he does not say that he, at any time, informed plaintiff of that fact, and as said, it is proved that plaintiff contemplated actual delivery unless the contracts were closed out prior to the delivery dates.

 In support of defendant's contention that these contracts were intended as mere wagers or to speculate in the rise or fall of prices, which under all the authorities strikes the transaction with nullity, he cites the fact that while there were in all 83 of such trades, yet all of them, except the last one, were closed out without actual delivery being made. The fact that these contracts were closed out without actual delivery may be a circumstance in support of the contention, but it is by no means conclusive. The validity of the contract depends upon the intent of the parties at the time made. Where the intent is to make actual delivery, the contract is valid. Such contracts are usually closed out prior to the delivery date. There are certain "lawful, customary and generally prevailing methods of closing out such contracts, settling them and discharging the parties thereunder which do not render such contracts wagering contracts or illegal, to wit, (1) by sales; (2) by direct set-offs; and (3) ringing off before the times of delivery specified in the contracts arrive, so that when those times come, no liability to deliver or to pay exists." Gettys v. Newburger (C. C. A.) 272 F. 209.

These methods of settling such contracts are recognized as valid and are authorized by the rules of the exchanges. 27 C. J. §§ 275, 276, and 277, p. 1063 et seq.

Since the law presumes that men in their transactions do not intend to violate the law and that they do not intend to make contracts not sanctioned by it, when one of the parties charges that the contract is invalid, the burden is upon him to prove his allegation. In the case at bar, defendant assumed a burden which he has not discharged. Hence he is bound.

For the reasons assigned, the judgment appealed from is reversed, and it is now ordered that plaintiff, Stewart Brothers, have judgment against and recover from defendant the full sum of $3,158.74 and legal interest thereon from judicial demand and all costs.