23 So.2d 801

**STATE v. DAVIS.**

No. 37742.

June 29, 1945.

Rehearing Denied Nov. 5, 1945.

Booth & Lockard, of Shreveport, for defendant-appellant.

Fred S. LeBlanc, Atty. Gen., M. E. Culligan, Asst. Atty. Gen., and Edwin L. Blewer, Dist. Atty., and William F. Woods, Jr., Asst. Dist. Atty., both of Shreveport, for plaintiff-appellee.

HAMITER, Justice.

In a bill of information filed by the district attorney of Caddo Parish it was charged that the defendant, J. L. Davis, on or about the 2d day of August, 1944, in the named parish, "did commit the crime of gambling as defined by Article 90 of the Louisiana Criminal Code." To the information defendant, through his counsel, tendered a motion for a bill of particulars, a demurrer, a plea of unconstitutionality, and a motion to quash, all of which were argued and submitted to the district court for decision.

Before a ruling was obtained on the motion for a bill of particulars, the state filed what is termed an "Answer to Motion for Bill of Particulars".

On the day of the filing of such answer, the court ordered a discharge of the motion for a bill of particulars, and it overruled the demurrer, the motion to quash and the plea of unconstitutionality. To all of the rulings defense counsel excepted, but no formal bills of exceptions were ever signed.

Subsequently, defendant, in a combination pleading styled "Demurrer and Motion to Quash and Plea of Unconstitutionality", reiterated all of the objections set forth in the overruled pleas, and he reurged especially that the information charges no of-

fense known to the laws of the State of Louisiana and further that it "is so vague, indefinite and uncertain that it fails to inform your defendant of the nature and cause of the accusation against him, as is required by Section 10 of Article 1 of the Louisiana Constitution." This combination pleading, after argument thereon, was also overruled.

Defendant was then tried by the district judge and found guilty. Before sentence, however, he filed a motion for a new trial and a motion in arrest of judgment. On these being overruled, defendant, to quote from the court minutes, "was sentenced to pay a fine of $500 and costs, default thereof to serve three months in jail, with an additional sentence of one year in jail. The accused was placed on ten months active probation." Thereupon an order of appeal was granted to defendant.

In the record of this appeal, defendant presents for our consideration 17 signed formal bills of exceptions. Those numbered 1 and 17 involve the same matters and were taken, respectively, to the overruling of the combination pleading styled "Demurrer and Motion to Quash and Plea of Unconstitutionality" and of the motion in arrest of judgment. Bills of exceptions numbered 2 to 15, inclusive, were reserved to rulings made by the district court during the trial of the case on the introduction of evidence. Bill of exceptions number 16 concerns the overruling of the motion for a new trial, defendant alleging therein that there was no legally admitted evidence to sustain the conviction.

With reference to bills of exceptions 1 and 17, defendant insists that the information fails to sufficiently charge any crime and, further, it denies to him the constitutional right to be informed of the nature and cause of the accusation. In the alternative, he contends that the statute forming the basis of the information (Article 90 of the Criminal Code) is vague, indefinite and uncertain and, therefore, unconstitutional.

The short form of information employed in this prosecution is authorized by the provisions of Act 223 of 1944, this being a statute that amended and re-enacted Article 235 of the Louisiana Code of Criminal Procedure, as amended by Act 147 of 1942. In such statute there are specifically set forth numerous short forms of indictments or informations that may be used in cases in which they are applicable, following which it is declared: .

"Provided that in all cases of crimes included in the Criminal Code but not covered by the short forms hereinbefore set forth, it shall be sufficient to charge the defendant by using the name and article number of the offense committed.

    *      *      *      *      *      *

"Provided further that the district attorney, if requested by the accused prior to arraignment, may be required by the judge to furnish a bill of particulars setting up more specifically the nature of the offense charged."

Thus the Act of 1944 provides for two kinds of short forms, namely, (1) those specifically set forth therein, and (2) those.

(where the crimes are included in the Criminal Code and are not otherwise provided for in the statute) which charge the offense by name and article number.

The offense of gambling, which defendant allegedly committed, is included in the Criminal Code and it is not covered by any of the short forms specifically mentioned in the statute; hence, according to the first quoted proviso, it was proper to charge in the information, by using the name and article number of the offense committed, that defendant "did commit the crime of gambling as defined by Article 90 of the Louisiana Criminal Code."

The question of whether or not the short form so used herein satisfies the constitutional guaranty that an accused shall be informed of the nature and cause of the accusation against him need not be determined. If the information as originally drafted be defective in that respect, the defect was cured by the answer filed by the district attorney pursuant to defendant's motion for a bill of particulars. In that answer, furnished before trial and which showed specifically the nature and cause of the offense, it was declared: "That the defendant is charged with committing the crime of Gambling as defined by Article 90 of the Louisiana Criminal Code, in that he did intentionally conduct and directly assist in conducting, as a business, a game, contest, lottery and contrivance wherein money, bets and wagers on the results of horse races were unlawfully accepted and made by the defendant herein, outside of the race tracks and enclosures, and whereby persons risked the loss of something of

value, namely: money, in order to realize a profit in money."

In the case of State v. Miller, 170 La. 51, 127 So. 361, 362, the defendant was indicted for the crime of larceny of $600 in money, the indictment being drawn in the applicable short form specifically set forth in Code of Criminal Procedure, Article 235. Some days before the trial, the district attorney, in answer to a defense motion, filed a bill of particulars informing defendant, among other things, as to the name of the owner of the money allegedly stolen. On the day of the trial a motion to quash the indictment was tendered. This motion was sustained and defendant discharged, the ruling of the court being based solely on the ground that the indictment did not give the name of the owner of the money. In its written opinion rendered on the appeal taken by the state, this court, after discussing briefly the question of whether or not the ownership of a particular person was an essential ingredient of the crime of larceny, commented as follows:

"In the instant case, however, the defendant called for the name of the owner of the money alleged to have been stolen and it was furnished to him.

"If, therefore, there was any defect in the indictment as originally returned and filed, that defect was cured at the request of the defendant himself.

"The indictment as amplified by the answer to the motion for a bill of particulars fully complied with the constitutional requirement that the accused shall have the

right to be informed of the nature and the cause of the accusation against him."

The indictment in State v. Brooks, 173 La. 9, 136 So. 71, 73, charged the defendant with the embezzlement of a certain check for $400 payable to the First Baptist Church of Covington, Louisiana. On the day of trial, sometime after his arraignment, defendant sought to withdraw his plea of not guilty and to file a motion to quash the indictment. The motion to quash alleged that the indictment did not set out with any degree of certainty that the First Baptist Church of Covington was the owner of the property allegedly embezzled, and that it must clearly show that defendant stands in a fiduciary relationship to the owner of the property embezzled. Defendant prayed that the motion be sustained and that the indictment be amended instanter, otherwise that it be adjudged null and void. The district court deemed it too late and an unnecessary cause of delay to permit the plea to be withdrawn and the motion filed; hence, defendant's request was refused. On an appeal, after defendant's conviction, this court held that error had been committed by the trial judge in refusing to allow the filing of the motion to quash, and it ordered a new trial. With reference to the refusal the following observation was made:

"That no further delay was intended by the defendant appears from the prayer of his motion that the indictment 'be amended instanter,' so as to clearly show the ownership of the check and defendant's fiduciary relationship to the owner.

"Whether the indictment be sufficient in these respects is not now a matter before this court for decision, as defendant was not permitted to withdraw his plea of not guilty and file his motion to quash.

"Be that as it may, defendant was unquestionably entitled to the amendments sought, as a bill of particulars, if nothing more, since this information was necessary to enable defendant to defend himself intelligently.

\*     \*     \*     \*     \*     \*

"The purpose of permitting a bill of particulars where a short form of indictment is used is to fully protect the accused, indicted under such form, in his constitutional right to be informed of the nature and cause of the accusation against him, and for this reason the provision as to a bill of particulars, where short forms of indictment are used, should be liberally interpreted."

The information in the instant case as amplified by the answer to the motion for bill of particulars charges defendant with gambling by the operation of what is commonly called a turf exchange or a handbook; it shows that he did, in violation of Article 90 of the Criminal Code (Act 43 of 1942), intentionally conduct and directly assist in conducting, as a business, a game, contest, lottery and contrivance wherein money, bets and wagers on the results of horse races were unlawfully accepted and made by the defendant herein, outside of the race tracks and enclosures, and whereby persons risked the loss of something of

value, namely, money, in order to realize a profit in money.

Article 90 of the Criminal Code reads:

"Gambling is the intentional conducting, or directly assisting in the conducting, as a business, of any game, contest, lottery, or contrivance whereby a person risks the loss of anything of value in order to realize a profit.

"Whoever commits the crime of gambling shall be fined not more than five hundred dollars, or imprisoned for not more than one year, or both."

Now the question arises: Is the operation of a turf exchange, i. e., a business wherein bets and wagers on the results of horse races are accepted and made outside of the race tracks and enclosures, included in the above-quoted definition of gambling? Defendant insists that it is not so included; the state contends, and the district judge held, that it is thereby covered.

In presenting their respective views on the question thus posed, counsel have cited numerous cases from this court and from other courts throughout the United States. We do not consider the cited authorities to be of much assistance here, because an analysis of them discloses that in most instances the statutes involved differ in many essential particulars from Article 90 of our Criminal Code, that which is presently to be interpreted.

In the interpretation of criminal or penal statutes, the general rule is that they are to be strictly construed in favor of the defendant. To this general rule,

however, the law provides certain limitations. Thus in 50 American Jurisprudence, verbo Statutes, Sections 410, 411, 412 and 415, it is said:

"Sec. 410.—Limitations upon Strictness of Construction.—The construction of a penal statute should not be unduly technical, arbitrary, severe, artificial, or narrow. A strict construction of penal statutes does not require the words to be construed so narrowly as to exclude cases that may be said to be fairly covered by them. The words used need not be given their narrowest meaning, or the less extended of two meanings, or their primary meaning, or, indeed, any meaning other than their full meaning. Mere verbal nicety, or forced construction, is not to be resorted to in order to exonerate persons plainly within the terms of the statute. Although the statute is penal, the courts may disregard captious objections and even the demands of exact grammatical propriety. In short, although criminal statutes are to be strictly construed in favor of the defendant, the courts are not authorized so to interpret them as to emasculate the statutes. In any event, where the language of a penal statute is plain and unambiguous and conveys a clear and definite meaning, there is no occasion for resorting to rules of statutory interpretation.

"Sec. 411.—Application of General Rules of Construction.—The rule that a penal statute must be strictly construed does not prevent the courts from calling to their aid all the other rules of construction and giving each its appropriate scope. This is true of the general rules that, in the construc-

tion of a statute, the courts take into consideration the meaning naturally attaching to the words used from the context, and prefer that meaning which best harmonizes with the context, that general words in a statute following a designation of particular subjects or classes of persons, are restricted by the particular designations, that a construction is to be avoided which will overturn long established principles of law, that a statute should be so interpreted, if possible, as to avoid inconsistency, and that every portion of an act should be given its proper effect.

"Sec. 412.—Legislative Intent as Controlling Factor.—The rule that the primary object in the construction of a statute is to ascertain the legislative intent, to be gathered from the language used, is as applicable to penal statutes, as it is to statutes generally. Such statutes, like all other statutes, should be so interpreted as to be in harmony with, preserve, and effectuate the manifest intent of the legislature, and an interpretation should be avoided which would operate to defeat the manifest intent of the legislature.

\*　　\*　　\*　　\*　　\*　　\*

"Sec. 415.—Purpose.—The rule that penal statutes are to be strictly construed does not prevent the consideration of the general purpose of the legislature, and does not require the rejection of that sense of the words used which best harmonizes with the design of the statute, or the end in view. To the contrary, such construction is favored which tends most fully to promote the object of the statute, and it has even been declared that only those cases

are within a penal statute as are within the purpose thereof. Sometimes, it is expressly provided that penal statutes are to be interpreted with a view to effect the objects for which they were enacted. However, although courts have often added a sanction to those prescribed for an offense created by statute where the circumstances fairly indicated this would further the essential purpose of the enactment, no such addition is permissible where the contrary definitely appears."

In Sutherland's Statutory Construction, 3d Ed., Volume III, Section 5606, the limitations on the rule of strict construction are announced as follows:

"The rule that penal or criminal statutes are given a strict construction is not the only factor controlling the interpretation of such laws; instead, the rule merely serves as an additional, single factor to be considered as an aid in determining the meaning of penal laws. This has been recognized time and again by the decisions. Thus cases will frequently be found enunciating the principle that the intent of the legislature will govern, and that a strict construction should not be permitted to defeat the policy and purposes of the statute. A federal district court has said, 'The strict construction of a criminal statute does not mean such construction of it as to deprive it of the meaning intended. Penal statutes must be construed in the sense which best harmonizes with their intent and purpose.' Likewise, the Michigan court in Hightower v. Detroit Edison Co., 262 Mich. 1, 247 N. W. 97, 86 A.L.R. 509, said: 'The rule of strict construction confines an offense to

the words of the statute, but it permits the words not only to be read naturally, but to be given a meaning in harmony with the purpose and intent of the law as far as it may be done without distortion of language.'

"In construing penal statutes the evils sought to be overcome must be given special attention. Some courts have even extended the meaning of such laws to persons and situations within their spirit and general purpose. For instance, in Caminetti v. United States, 242 U.S. 470, 37 S.Ct. 192, 61 L.Ed. 442, L.R.A.1917F, 502, Ann.Cas. 1917B, 1168, the Mann Act [18 U.S.C.A. § 397 et seq.] was held applicable to the transportation of women across state lines for 'other immoral purposes,' although the law of the state into which they were taken did not make such activity a crime.

"The rule of strict construction does not require that penal statutes be given the 'narrowest meaning' that the words of the statute will allow. Instead, the language of the statute should be given a reasonable or common sense construction, consonant with the objects of the legislation. It has been said, 'While criminal statutes must be strictly construed to avoid the creation of penalties by construction, such reasonable view must be taken of a statute as will effectuate the manifest intent and purpose of the lawmakers.' Again, the Pennsylvania court said, 'It is, of course, true * * * that penal statutes must be strictly construed. But that also means, as has frequently been said, that they must be construed with common sense.' "

■■ · Since this defendant is charged with violating a provision of the Louisiana Criminal Code, the following extract from Crawford's Statutory Construction, 1940 Edition, Section 324, relative to the construction of Codes, is pertinent:

"A code is simply a part of the statutory law and has no higher standing or sanctity than an ordinary statute. Like many other legislative enactments, a code or revision should be subjected to a liberal construction, in order to promote the objects for which it was enacted—to clarify existing statutes—although the liberality of construction should not be extended so far as to annul any of the code's provisions or to defeat the intention of the legislature as revealed in any particular section or portion thereof.

"In seeking the legislative intent in any code provision, the court may look into the history of the legislation on the subject under consideration; it may consider the conditions and circumstances which led the legislature to enact the particular provision, and examine prior as well as contemporaneous legislation on the same subject. Of course, the provisions of the revision or code should first be examined in order to ascertain their meaning, but where the language is ambiguous and uncertain, the original statutes, as well as those in pari materia, may be resorted to for assistance in seeking the legislative intent. * * *"

Looking into the history of the legislation on the subject under consideration we find that continuously since the year 1879 the Legislature has been charged with the duty of enacting laws to prohibit gambling.

Article 172 of the Constitution of that year provided: "Gambling is declared to be a vice, and the General Assembly shall enact laws for its suppression." The identical provision was carried into the Constitutions of 1898 and 1913, Art. 188. The present Constitution (1921) imposes the same duty Art. 19, § 8. Pursuant to that mandate of the several Constitutions, the Legislature has enacted various statutes concerning gambling. Until the passage of Act 43 of 1942 (the Criminal Code) it legislated against particular and specific types of gambling, such as banking games, pool rooms, turf exchanges, slot machines, dice games. Included among those specific statutes are Act 127 of 1904 (to suppress turf exchanges), Act 128 of 1904 (to suppress pool rooms), Act 57 of 1908 (to prohibit gambling on horse races by the operation of betting books, etc.), and Act 127 of 1920 (to make unlawful the promoting, by means of any system, method or device, of betting upon the result of horse races at places other than where the races take place).

Not only has the Legislature for many years denounced the operation of turf exchanges or hand books, but also the judiciary has given recognition, in no uncertain terms, to the evils of such devices. In State v. Maloney, 115 La. 498, 39 So. 539, 544, the defendant was charged under Act 128 of 1904 with the operation of a pool room. For the purpose of the trial, however, it was admitted that he was actually operating a turf exchange. In affirming defendant's conviction and sentence this court said:

" * * * In both decisions ([City of Shreveport v. Maloney], 107 La. 193, 31 So. 702, and [Shreveport v. Schulsinger], 113 La. 9, 36 So. 870 [2 Ann.Cas. 69]) the business of operating a pool room or turf exchange was recognized as an 'evil' which might be regulated, discriminated against, or suppressed by the state in the exercise of its police power. In both cases the opinions show that the business conducted was betting or receiving bets on horse races out of view of the tracks. Hence we may conclude that both acts of 1904 were intended to suppress such business, whether called a 'turf exchange' or 'pool room'. * * *

"The evil sought to be remedied by the legislation of 1904 was notorious and unquestioned, and was a matter of public concern, not only in Louisiana, but in other states of the Union. Judges must know, as everybody knows, that this evil was gambling on horse races through the medium of pool rooms and turf exchanges.

"We therefore hold that the words of the statute are sufficiently certain to indicate the particular offense intended by the lawmaker."

The defendant in State v. Austin, 142 La. 384, 76 So. 809, 811, appealed from a judgment of conviction for gambling, by orally operating a betting book on a track in the Parish of Jefferson where a horse race was being run, he having been prosecuted under Act 57 of 1908. The judgment of conviction was reversed, this court observing: "Bookmaking orally, or by writing, is public gambling by quoting and laying insidious odds to a number of people; but it was the written bookmaking, in our opinion, which the Legislature denounced in the

statute of 1908." The court further said in the course of the opinion, however, that:

"There are many laws against gambling; and in 1904 the Legislature passed Act No. 127, p. 291, to suppress gambling on races in pool rooms and turf exchanges, where the evil was notorious and unquestioned. City of Shreveport v. Maloney, 107 La. 193, 31 So. 702; State v. Maloney, 115 La. 498, 512, 39 So. 539; Shreveport v. Schulsinger, 113 La. 9, 36 So. 870, 2 Ann.Cas. 69.

"Gambling on or near race tracks or courses had become flagrant, obnoxious, and dangerous to public morals, and the Legislature in 1908 passed act numbered 57, p. 64, to suppress it, by penalizing the gambler who operated a betting book upon any track or course where any kind of a horse race or races were being run, trotted, or paced."

Thus it appears that for years the framers of our Constitutions, the Legislature and the judiciary have consistently denounced gambling, especially that form carried on by way of the operation of turf exchanges. Now, with this brief historical background in mind, let us seek to determine the intent and purpose of the Legislature in the enactment of Article 90 of the Criminal Code (Act 43 of 1942), until which time many of the above-mentioned specific statutes on gambling were in force and effect, particularly the Acts of 1904, 1908 and 1920 relative to betting on horse races.

The Criminal Code (Act 43 of 1942) was adopted by the Legislature after it had received and considered a project thereof, prepared and furnished by the Louisiana Law Institute pursuant to the provisions of Act No. 7 of 1940. At the same session (1942) the Legislature also passed Senate Concurrent Resolution No. 12, page VIII reading as follows:

"WHEREAS, the Louisiana State Law Institute, the Reporters, Advisers and Research Assistants who prepared the PROJET OF THE CRIMINAL CODE OF THE STATE OF LOUISIANA, which proposed Criminal Code appears as Senate Bill No. 17 of this Session of the Legislature, have done an excellent and thorough job, and

"WHEREAS, the information contained in the 'COMMENTS' on each proposed article is of inestimable value and will be an important and useful source of information for all persons using said Code, if adopted, and

"WHEREAS it would be fitting that these valuable COMMENTS be included in the official printed copy of said Code, if adopted, both as a tribute to those who worked so diligently in its preparation, and as a source of useful information to the users of the proposed Code, now

"THEREFORE, Be It Resolved by the Senate, the House of Representatives concurring, that in printing the Criminal Code, if adopted, as authorized and directed by Act 7 of the Legislature of the year 1940, the COMMENTS as contained in the projet be printed therein, as footnotes, with such changes in said COMMENTS as may be necessary because of amendments to the proposed Code adopted by this Legis-

lature, the changes to be made by the Reporters.

"Be It Further Resolved, etc., that proper recognition for the preparation of the COMMENTS be given in the title pages of the printed volume, as authorized by Act 7 of 1940."

■ In accordance with the direction of that concurrent resolution, the mentioned comments were printed as footnotes to the applicable articles of the adopted Criminal Code; and since they have legislative sanction, we deem it appropriate and proper to take into consideration those furnished in connection with Article 90 in our endeavor to construe its provisions. This course finds support in 50 American Jurisprudence, Section 325, which reads in part: "It has been held proper to take into consideration reports of a commission transmitted to the legislature on a particular subject, for the purpose of construing a statute framed with special regard to the recommendation. This rule has been applied to a commission appointed by the executive, and under a legislative act. Such a report of a commission may be resorted to for the purpose of determining the mischief which the statute was designed to remedy."

Among the footnotes to Article 90 of the Criminal Code is one to which defense counsel direct attention, it reciting that, "No attempt has been made to punish the patrons of gambling establishments because of the apparent impossibility of enforcement. Only those operating gambling devices as a business and those assisting directly are covered." Their reference to that comment follows this statement found in their brief: "It is generally conceded by every one that the definition of gambling under discussion does not reach the person who bets or wagers in a gambling house or otherwise." We agree that Article 90, unlike many of the specific statutes on gambling that were repealed by the Criminal Code, does not penalize the players or patrons at gambling establishments. To offend its provisions, an analysis will disclose, one must commit the enumerated acts as a business. The article commences: "Gambling is the intentional conducting, or directly assisting in the conducting"; then follows the modifying or qualifying, but exceedingly significant, phrase, "as a business"; and it concludes: "of any game, contest, lottery, or contrivance whereby a person risks the loss of anything of value in order to realize a profit." Thus the Legislature of 1942, by the article under consideration, was striking at and legislating against only commercialized or organized gambling, not gambling by individual players or patrons.

■ But what particular types or forms of commercialized gambling are intended to be covered by the definition? A footnote to the article seems to provide the answer to this question. There it is said: "The article is intended to apply to *all forms of organized gambling whatsoever, save and except those legalized by special statutes.*" That such was the intent of the Legislature is shown by the fact that in the enactment of the Criminal Code (Act 43 of 1942) all of the specific statutes on gam-

bling were repealed, except those by which certain forms of gambling had been legalized. Among those expressly repealed were the above referred to statutes of 1904, 1908 and 1920 which pertained to the operation of turf exchanges. Among those recognized as continuing in force is Act 276 of 1940 which created the Louisiana State Racing Commission. Moreover, in another footnote Act 128 of 1904, which provided for the suppression of pool rooms but was held in State v. Maloney to prohibit the operation of turf exchanges, was listed as being covered or superceded by the article. (Italics ours.)

Defense counsel argue, however, that the acceptance of bets on the result of a horse race is nothing more than the making of wagers, and that a transaction of that nature does not come within any one of the four classifications listed in the article, namely, a game, contest, lottery or contrivance.

■ The article, it will be noticed, is general in its scope and application; of necessity it must be to include all forms of organized gambling. It would be almost impossible for a single article of a Code to enumerate the hundreds of types of commercialized gambling that the human mind has conceived and can devise. Considering this, as well as the fact that the object and purpose of the legislation is to penalize all gambling businesses not legalized by statute, certainly it must be held that the conducting of a turf exchange or betting book is covered by the broad provisions of the article. It is inconceivable that the Legislature would have intentionally permitted to again run rampant throughout this state one of the most objectionable and offensive forms of gambling—one which that body, the judiciary, and the policing authorities have long sought to suppress. If not included in the words "game, contest, lottery," a turf exchange or betting book is covered by the word "contrivance" as used in the article.

■ Webster's New International Dictionary, 2d Ed., gives as one definition of "contrivance": "A thing contrived or used in contriving; a scheme, plan, or artifice." And, as an illustration, it provides the sentence: "Government is a contrivance of human wisdom. Burke." Furthermore, according to that authority, "contrivance" is synonymous with "device". Hence, a turf exchange is a contrivance, a scheme, a device, a plan, through the medium of which wagers or bets are placed on the results of horse races that are run at distant tracks.

Of such a conclusion defense counsel are exceedingly critical, they arguing that "by holding that a game or contrivance means any plan or scheme by which gambling is permitted, then the cotton, commodity, or stock dealer who furnishes a ticker tape and who sells on margins, and the purchaser who stands to gain or lose on the result of an uncertain event, to-wit: the rise or fall of the stock market, is just as liable as the turf exchange operator who sells or accepts a wager on the result of another uncertain event, to-wit: the result of a horserace. In principle there is simply no difference."

The answer to this argument is that the licensed cotton, commodity or stock dealer does not operate illegally so long as there exists the intention of making an honest and bona fide delivery of the articles or commodities sold. Stewart Bros. v. Beeson, 177 La. 543, 148 So. 703; Section 8, Article 19 of the Louisiana Constitution of 1921.

Therefore, it is our opinion that the Legislature in adopting Article 90 of the Criminal Code acted in behalf of remedying, and successfully legislated against, the evil, among many others, of gambling on horse races through the medium of turf exchanges—an evil, as declared in State v. Maloney, supra, that is notorious and unquestioned and a matter of public concern not only in Louisiana but also in other states of the Union.

■ Defendant's alternative contention that the statute forming the basis of the information is vague, indefinite and uncertain and, therefore, unconstitutional (all of which is urged under bills of exceptions 1 and 17), is without merit. In the recent case of State v. Varnado and Blackwell, La.Sup., 23 So.2d 106 (rehearing refused June 5, 1945), it was held that Article 90 of the Criminal Code is not vague in its definition of gambling.

Bill of exceptions number 2 was reserved to the ruling of the trial court in admitting into evidence defendant's cash journal. The judge's per curiam with reference to the bill reads as follows:

"The defendant had been arrested for operating a gambling business, was taken

to the district attorney who directed the arresting officers to return and obtain defendant's records. The bookkeeper refused to deliver the book until after he, the bookkeeper, talked to the defendant which was done at the time over the telephone, and the defendant directed his bookkeeper, Mr. Brice, to deliver the books to the arresting officer. Mr. Brice further identified the book from the witness stand. Therefore, the book—as the book of defendant's business—having been identified as such, was admissible in evidence. Particularly as an incident that a business was being operated —that it had books. The Court was not called upon to rule on the contents of the cash journal. The judgment of conviction was based on evidence dehors the book.

"We might add that the evidence showed that in the Subway Billiard & Pool Parlors, there was conducted a cafe, cold drinks and pool and domino tables, which was operated in the front part of the building. The horse racing business was carried on in the rear of the building. Mr. Brice kept the books for the whole. The cash book offered contained no entries affecting any of the businesses in the front of the building, hence, covered entries of the business carried on in the rear of the building—which was the gambling part of the business."

■ Defense counsel complains that the cash journal was obtained through compulsion, and as a consequence there was a violation of the self-incrimination provision of the Louisiana Constitution, Article 1, Section 11. Defendant, as we appreciate the evidence and as shown by the per curiam, was not compelled to produce such book;

it was voluntarily placed by him in the hands of the district attorney. Moreover, it appears that it was received in evidence for the restricted purpose of showing that the alleged gambling activities of defendant were carried on as a business, and that it was so considered by the court. For that purpose, and under the circumstances shown, we think it was admissible.

The contention is made, under bill of exceptions number 3, that the court erred in permitting to be introduced in evidence three bundles of tickets (marked S-1, S-2, S-3) obtained, along with the cash journal, by the arresting officers from the business establishment of defendant with the aid of the bookkeeper, Brice. The offering was objected to, first, because the exhibits had not been identified by any one, and, second, because they were undated slips of paper and there was no proof that the defendant knew of the presence of the documents. As to the first objection, three witnesses (King, Brooks and Sapaugh) identified a number of the tickets taken from the bundle marked S-1 as being in their own hand-writing and evidencing bets placed by them with the defendant on horse races. On the tickets are written the initials of the bettors, the names of the horses, the amounts of the bets, the odds, and other information relating to turf exchange operations. The tickets thus identified were the only ones from the three bundles considered by the judge, according to his per curiam, in reaching his decision. As to the second objection a slip on top of the S-1 bundle, from which the identified tickets were taken, bore the notation August 2,

1944, the date of the offense charged herein. True, the state did not prove who wrote such date (this proof would have been most difficult to obtain); but it can be assumed that defendant, or some one in his employ, was responsible for and knew of the notation since all three bundles were a part of the records of defendant and were obtained at his place of business. Certainly the identified tickets were admissible in evidence. If the remainder of the three bundles were improperly admitted, defendant was not prejudiced thereby; they were not taken into consideration by the trial judge.

Similarly, there was no prejudicial error in allowing the introduction in evidence of an invoice rendered by one Ed F. Disharoon, to which ruling defendant reserved bill of exceptions number 4. As stated in the judge's per curiam, "the court did not consider this document in any manner in reaching a verdict of guilty."

Bill of exceptions number 5 was reserved when the witness Brice (defendant's bookkeeper) was permitted to testify that defendant was the owner and operator of the establishment, it being urged that the question called for the opinion of the witness. The following remarks of the trial judge amply sustain his ruling:

"The witness Brice was a very unwilling witness, however, he testified that he was employed as bookkeeper by defendant. Certainly one who is employed by another and works in the establishment can state whether his employer is the operator of the business. It appears as a mixed question

of law and facts. However, the evidence of Brice on this point may be eliminated entirely, for Mr. Ezell, one of the arresting officers, testified that while defendant was in the District Attorney's office, the defendant was asked who conducted the business and the defendant answered that he had a partner (in the ownership) who was sick in the hospital and that he—the defendant—was operating the business. This was not denied.

"The error, if any, was not prejudicial to defendant."

■ A bill of exceptions (number 6) was also reserved to the admitting in evidence of the testimony of Officer Ezell regarding the above-mentioned statement made by defendant that he was operating the business. The objection was that the question called for a conclusion on the part of the witness, and, further, that before the state could prove an admission or confession it must first establish the corpus delicti. The witness, as we view the question propounded, was not asked to testify to a conclusion reached by him; he was requested to repeat a positive declaration made by defendant to the district attorney. As to the second part of the objection the state, according to the record, had already proved the commission of the offense charged when defendant's declaration was sought to be admitted.

Bills of exceptions numbers 7 to 10, inclusive, were reserved to rulings of the court in refusing to permit four of the state's witnesses (Brice, King, Sapaugh and Brooks) to avail themselves of the immunity against self-incrimination granted by

Section 11, Article 1 of the Louisiana Constitution. Brice claimed immunity when questioned about his duties as bookkeeper for defendant. The other witnesses asserted self-incrimination by testifying to their placing of bets on horse races in defendant's establishment, first, because the City of Shreveport has an ordinance against wagering, and, second, because Act 276 of 1940 imposes a penalty on any one who bets on horse races.

■ If it be conceded arguendo that the court erred in compelling the witnesses to testify over their objections, defendant is without right, in our opinion, to take advantage of the error. The constitutional privilege of immunity is wholly personal to the witness; it can not be claimed by or for another. Supporting this view is the following extract from 70 Corpus Juris, verbo Witnesses, Section 906: "* * * It is likewise the rule that the privilege of a witness at a trial of refusing to answer on the ground of self-incrimination is for the protection of the witness, and not for that of any other parties, so that, while the privilege may, and should, be claimed by the witness, it is a personal privilege of the witness and cannot be claimed by the witness for the benefit of another. Moreover, the counsel for the witness may not claim the privilege in behalf of such witness. So neither the party against whom the witness is called to testify, nor such party's counsel, nor the party calling the witness, not such party's counsel, nor the court, can claim the privilege for the witness. * * *"

Cited in a footnote to the quoted section of Corpus Juris is the case of State v. Wil-

kins, 156 Wash. 456, 287 P. 23, 24 (Supreme Court of Washington) in which the court said:

"If it be conceded that the claim of privilege was properly made by the witness which we think under the record is very doubtful, and, if it be conceded that the ruling of the trial court in compelling him to testify was error, which we also think was very questionable, yet such error, if any, cannot be taken advantage of by the defendant, as the claim of privilege is a personal one to the witness, and the defendant cannot insist upon it. One of the leading cases on this matter is Samuel v. People, 164 Ill. 379, 45 N.E. 728, 729, where the court stated:

" 'It is not contended that the evidence given by the witness King was not competent evidence under the issues involved, but it is claimed that the defendant below is entitled to complain, because King was compelled to testify, although claiming his privilege. This is a matter of which the witness alone can complain, and of which the plaintiff in error can take no advantage, as being error committed against himself. The privilege is that of the witness, and not of the party; and counsel will not be allowed to make the objection. The privilege cannot be interposed by either party to the action, nor can either party raise the objection on behalf of the witness. It must be claimed by the witness in order to be available, and it lies with him to claim it or not, as he may choose. As the privilege is personal to the witness, he may waive it, and elect to testify. * * * This being so, the evidence is equally good

where the witness instead of giving it voluntarily, is compelled to give it. * * *' "

Bill of exceptions number 11 was reserved to a ruling of the court in refusing to sustain defendant's objection to the district attorney's leading and suggestive question, propounded to state witness Brooks, that: "You have seen other people go up to this window, same window that you would go to to place your bets?" In view of the trial court's comment that Brooks was an unwilling witness, and, hence, the district attorney was permitted to cross-examine him, the form of question so employed was proper.

Bill of exceptions number 12 was reserved to the ruling permitting the state to offer in evidence 14 tickets identified by the witnesses King, Sapaugh and Brooks as being evidence of wagers made by them at defendant's place of business. The objection urged to the offering was "that it has not as yet been established that there was any illegal activity or any violation of Article 90 of the Criminal Code on or about August 2, 1944, and that the offering is premature until such evidence has been offered or in any event it should only be filed in evidence subject to connection. In other words, subject to proof that there was an offense committed on or about August 2." The identified tickets, which were clearly admissible, were links in the state's chain of proof. The objection addresses itself to the weight of the evidence, rather than to the admissibility thereof, and it was correctly overruled.

Bill of exceptions number 13 was reserved to the ruling of the court in allow-

ing the district attorney to cross-examine the witness Brice (defendant's bookkeeper) concerning testimony given by him before the Grand Jury. In explanation of the ruling the judge's per curiam recites: " * * * The evidence that was given before the Grand Jury, if any, was not offered in evidence in this case. Furthermore, the answers given to the questions inquired about before the Grand Jury is not the evidence on which the defendant was found guilty, and if the ruling was erroneous, the defendant has not been prejudiced."

In view of the recitals of the per curiam it does not appear that prejudicial error was committed.

Bills of exceptions numbers 14 and 15 were reserved when the court overruled defendant's objection to questions propounded to the witness Brice by the district attorney in which the witness was asked if he knew the meaning of certain figures on several of the tickets that were offered in evidence. Defense counsel, under the objection, insisted that the questions were improper unless it be first shown that the witness made the notations or figures. The witness, as correctly explained by the trial judge, did not have to make the notations in order to answer "Yes" or "No" to the questions propounded; hence, the objection was properly overruled.

Bill of exceptions number 15 was reserved to the failure of the court to sustain the motion for a new trial, the primary allegation of the motion being that there was no legally admitted evidence upon which to convict defendant.

This court, under its well-settled jurisprudence, cannot pass upon the sufficiency of the proof in a criminal case where there is some evidence adduced, no matter how little, to sustain the conviction; that is a matter with which the trial judge and jury are exclusively concerned. It can and will, however, determine whether or not there is any legally admitted evidence at all of a fact essential to a conviction. State v. Gani, 157 La. 231, 102 So. 318; State v. Dunnington, 157 La. 369, 102 So. 478; State v. Nomey, 204 La. 667, 16 So.2d 226.

Our examination of the record discloses that there was legally admitted evidence to serve as a basis for defendant's conviction. Besides the above discussed identified wagering tickets, produced from the bundle that bore the notation August 2, 1944, and the testimony that defendant was operating the business in question, there is evidence in the record to the effect that when arrested defendant was in a cage-like office, located in the rear part of the Subway Pool & Billiard Parlor in Shreveport, using a telephone, referring to and checking with a racing form, and writing on a pad. Attached to the front of the cage, which contained small windows similar to those found in banks, were four or five signs bearing instructions appropriate to race horse betting, one reading "make out your own slips." Also installed in the office was a loud speaker which was used in announcing the progress of races. All of such evidence was legally and properly admitted.

For the reasons assigned the conviction and sentence are affirmed.

FOURNET, J., dissenting in part; HIGGINS and PONDER, JJ., dissent.

HIGGINS, Justice (dissenting).

On August 25, 1944, the district attorney filed an information against the accused charging that he did on or about the 2d day of August, 1944, " * * * commit the crime of gambling, as defined by Article 90 of the Louisiana Criminal Code * * *". The defendant filed a motion for a bill of particulars, which was furnished by the State, as follows: " * * * That the defendant is charged with committing the crime of gambling as defined by Article 90 of the Louisiana Criminal Code, in that he did essentially conduct and directly assist in conducting, as a business, a game, contest, lottery or contrivance, wherein money, bets and wagers on the results of horse-races were unlawfully accepted and made by the defendant herein, outside of the racetracks and enclosures, whereby persons risked the loss of something of value, namely: money, in order to realize a profit in money. * * * "

The defendant then filed a demurrer or a motion to quash, which was overruled, and, after a trial on the merits, resulting in his conviction, he filed a motion in arrest of judgment based substantially on the same grounds as his previous motion. This motion was overruled and a bill of exception was reserved, and after sentence, the defendant appealed.

The accused contends that the conviction and sentence are illegal because the bill of information was fatally defective in that it completely failed to inform him of the nature and cause of the accusation against him, as required by Section 10 of Article I of the Constitution of Louisiana; that the bill of particulars forms no part of nor amends the bill of information, its sole function and purpose being to furnish the defendant additional information and limit the State's proof; and that it is mandatory under Section 9 of Article I of the Constitution, that the prosecution shall be by indictment or information and not by a bill of particulars.

The pertinent part of Section 9, Article I of the Constitution, reads: "Prosecution shall be by indictment or information; * * *."

Section 10 of Article I of the Constitution of 1921 reads in part as follows: "In all criminal prosecutions, the accused *shall be informed* of the nature *and cause* of the accusation against him; * * *." This provision is identical with the one contained in Amendment VI of the Constitution of the United States. (Italics ours.)

In Webster's New International Dictionary, 2d Ed., the noun "Cause" is defined as "A ground of action * * *."

In Volume 6, Words & Phrases, Perm. Ed., at pages 322-324 and 327, we find:

" 'Cause' is defined as any occasion or condition upon the occurrence of which an event takes place. * * *

"Philosophically speaking, the sum of all the antecedents of any event constitutes its 'cause.' Ordinarily, however, each separate antecedent of an event is considered as a 'cause' for such event, provided, however,

that the event could not have happened except for such antecedent; in this case, that which supplies a motive, decides action, or constitutes the reason for anything done; that which produces or effects a result, or from which brings proceeds, and without which would not exist; that which produces an effect, or which brings a thing to be; that condition which determines the final result; that on which a thing under given circumstances follows. Griffin v. Anderson Motor Service Co., 227 Mo.App. 855, 59 S.W.2d 805. 808. * * *

"The constitutional provision that in all criminal prosecutions the accused has the right 'to be informed of the cause and nature of the accusation' against him, means that the offense must be set out with clearness and all necessary certainty to apprise the accused of the crime with which he stands charged. United States v. Noelke, C.C., 1 F. 426, 431, citing United States v. Cruikshank, 92 U.S. 542, 568, 23 L.Ed. 588.

"Const. art. 1, § 10, providing that in all criminal prosecutions the accused hath a right to demand the nature and cause of the accusation against him, means that the facts constituting the offense must be set forth in the indictment with sufficient certainty, that the accused may know what he is called on to answer, so that he may prepare his defense accordingly. Norris v. State, 33 Miss. 373, 376.

"The word 'cause' is defined to mean that which produces or effects a result; that from which anything proceeds, and without which it would not exist. It is said that the word is used in this sense in the usual constitutional provision that a person accused of crime is entitled to demand the nature and cause of the accusation against him, and that, inasmuch as the effect cannot exist without a cause, a good indictment cannot, as a rule, exist without a statement of the essential facts and circumstances which are the cause of the alleged crime or result. State v. Dougherty, 4 Or. 200, 203."

It will be observed that Sections 9 and 10 of Article I place the mandatory obligation on the State in instituting a prosecution to do so by indictment or information in which it is its duty to inform the accused, who is presumed to be innocent, not merely of the accusation but of the nature and cause of the accusation.

The information in the instant case informed the accused of the accusation, and it may be stated that it also, in a general way, informed him of the nature of the accusation because it apprised him of the fact that he was charged with gambling, as defined by Article 90 of the Louisiana Criminal Code. Surely, it cannot be said that the information informed the defendant of the "cause of the accusation" or the "ground of the accusation" because it leaves the accused and the court absolutely and totally uninformed as to the cause of the accusation. There is nothing stated in the information which would identify it with any offense whatsoever. The allegation is strictly a conclusion of law only. The language of the information is so general it could be applied to any conduct that the district attorney might have had in the secret recesses of his mind and which con-

duct might not in any way be a violation of the law. When the Constitution, in the clearest and plainest language, makes it the mandatory duty of the State in instituting a prosecution against an accused by an information or an indictment to inform him of the cause of the accusation and the bill of information or bill of indictment fails to do so, it certainly does not set forth a legal charge against the defendant and he is entitled to have the information and indictment annulled on a motion to quash or a demurrer, or to have a conviction secured thereunder set aside by a motion in arrest of judgment. The State or Legislature or the District Attorney or district judge cannot substitute a different method or way of informing the accused of the cause of the accusation, because the Constitution makes it mandatory to inform him in a particular way. The authors of the Code of Criminal Procedure recognized this fact in providing that the accused would have the right to have an information and indictment which was fatally defective, annulled by a demurrer or a motion to quash or to have the conviction obtained thereunder set aside by a motion in arrest of judgment. These authors, in providing for a bill of particulars, did so only in instances where the indictment or information was legal and informed the accused of the nature and cause of the accusation against him, but the accused desired additional information to make the charge more certain, to better prepare his defense and to limit the State's evidence. In such cases, the framers of the Code of Criminal Procedure left it to the discretion of the trial judge as to whether or not he would grant the accused the additional information sought through a bill of particulars. If the trial judge refused to grant the defendant such relief, the only question on appeal before this Court would be whether or not the trial judge had acted capriciously or arbitrarily in exercising his discretion. Obviously, a bill of particulars is not a remedy in any way comparable to a demurrer, motion to quash, or motion in arrest of judgment, all of which give the accused the right to have the legal issues presented to the trial and appellate courts as a matter of right and not as a matter of sufferance at the hands of the district judge. An accused is presumed to be innocent. He is under no obligation or duty whatsoever to assist the State, by a bill of particulars, to make valid an invalid charge against him. This responsibility is placed directly and solely upon the State and the accused has the right to insist that the State make the charge in accordance with the Constitution and the laws of this State.

It is the overwhelming weight of authority throughout the United States that a bill of particulars does not form any part of nor amend the indictment but simply furnishes the defendant with additional information so as to better prepare his defense and limit the State's proof. State v. Bienvenu, 207 La. 859, 22 So.2d 196, and 27 Am.Jur. 672, Sec. 112.

The State contends that Article 90 of the Criminal Code is a special and not a general statute. It reads as follows:

"Gambling is the intentional conducting, or directly assisting in the conducting, as

a business, of any game, contest, lottery, or contrivance whereby a person risks the loss of any thing of value in order to realize a profit.

"Whoever commits the crime of gambling shall be fined not more than five hundred dollars, or imprisoned for not more than one year, or both."

It will be noted that the Article merely gives a general definition of what constitutes the crime of gambling. The State concedes that Article 90 of the Criminal Code superceded all laws against gambling previously in effect because Section 2 of Act 43 of 1942 generally referred to as the Louisiana Criminal Code repealed a number of specific statutes with reference to gambling. Consequently, it cannot be successfully urged that Article 90 is a special and not a general statute. A mere reading of the provisions of the Article shows that its definition of what is gambling is so general that the statute can be violated in multiple ways. Therefore, when the information was filed against the accused and he was referred to Article 90 of the Criminal Code, all he was informed upon was that the Legislature had passed a general statute prohibiting gambling. There was no cause of the accusation even referred to—that is, the ground or basis upon which the prosecution rested.

As the bill of particulars, under the overwhelming weight of authority, does not form any part of nor amend the information, obviously, under the express provisions of the Constitution above quoted, the State could not institute a prosecution

upon a bill of particulars and secure a valid conviction thereunder.

The practical effect of the majority opinion is to give preferential effect to a misconstruction of a legislative act instead of the clear and unambiguous provisions of the Constitution which are paramount and should prevail. Since the State concedes that it should furnish the defendant with the cause of the accusation against him in a bill of particulars because he is entitled to that right under this Constitution, it becomes obvious that the State should have furnished that information in the bill of information as it is required to do by the above-quoted mandatory provisions of the Constitution. If the majority ruling in the instant case could be confined to its facts, probably little harm would result, but when it is contemplated that this ruling will be general and apply to all criminal prosecutions, it becomes apparent that the holding will have a far-reaching and harmful effect in the orderly and just administration of our criminal law. These safeguards placed in our Constitution to protect innocent persons against arbitrary prosecutions are now being practically eliminated. Uninformed and unrepresented accused will be pleading guilty to bills of information and indictments without being informed as to the cause of the accusation against them and might well be pleading guilty to a charge when they are absolutely innocent, simply because the district attorney, even though in good faith but erroneously, believes that there has been in his opinion a violation of the law. The framers of the Bill of Rights of the

United States and State Constitutions did not so lightly regard a person's freedom and liberty.

Under the majority ruling, every accused represented will ask for a bill of particulars and the State will be compelled to furnish the information which the Constitution in the clearest language stated should be given to him in the indictment or information and not by a bill of particulars. Since it was a simple matter for the State to furnish the information or the cause of the accusation against the accused contained in the bill of particulars, it was equally easy to have inserted the cause of the accusation in the information. Finally, it may be pointed out that the Constitution unquestionably and unmistakably grants an accused the right to be informed of the nature and cause of the accusation against him in the indictment or information and this language certainly does not contemplate a charge which is conjectural and so general as to be meaningless. The confusion created by this type of information which totally fails to inform the accused of the cause of the accusation against him certainly leaves him in a position where he is uninformed and has to guess what is contained in the secret recesses of the district attorney's or grand jurors' minds. Under the prevailing view the only other alternative the defendant has is to assist the State in making valid its invalid charge by asking for a bill of particulars, the granting of which is left to the trial judge's discretion.

Reliance is placed on the case of State v. Miller, 170 La. 51, 54, 127 So. 361, 362.

The case is not in point or controlling here, first, because it makes no reference to Section 9 of Article I of the Constitution, making it the mandatory duty of the State to institute the prosecution by indictment or information and not by a bill of particulars; second, the author of the opinion clearly states that both before and after the adoption of the Code of Criminal Procedure, it was not necessary, in charging larceny, to allege ownership in a particular person; and, third, without citing any authority to support the statement, it was stated that the indictment as amplified by the bill of particulars complied with the constitutional requirement that the accused shall be informed of the nature and cause of the accusation against him, when the overwhelming weight of authority is that a bill of particulars neither amends nor forms a part of a bill of indictment or information.

The point is made that since Article 90 of the Louisiana Criminal Code is sufficiently certain to meet the constitutional requirement of informing the public what conduct or acts would constitute a violation of its provisions that an information or an indictment drawn in the identical words of the statute would necessarily sufficiently inform the accused of the nature and cause of the accusation, thereby making the charge a valid one. This contention overlooks the fact that we are dealing with two different constitutional requirements; (1) That the legislative act must be sufficiently clear so as to inform the public what conduct or acts would constitute a violation of the statute. This, of

course, is a restriction on legislative power and is for the protection of the members of the public from being held responsible for acts which were considered lawful because the provisions of the statute did not clearly cover them. (2) The second one is entirely different because the hereinabove quoted provisions of the Constitution make it mandatory for the State to institute a prosecution by a bill of indictment or information in which the accused must be informed of the nature and cause of the accusation against him. Briefly, the ground upon which the accusation is founded. It is clear that the two requirements are different—the first one permits a general definition, which if sufficiently clear meets the constitutional test, but the latter requires something additional—specifically, the cause or ground of the accusation.

For these reasons and those assigned in the dissenting opinions which become the majority view on rehearing, in the case of State v. Varnado, La.Sup., 23 So.2d 106, I respectfully dissent.

FOURNET, Justice (dissenting in part and concurring in part).

I concur in the conclusion reached in the majority opinion that gambling as defined in Article 90 of the Louisiana Criminal Code is neither vague nor unconstitutional for the reasons urged in the several motions and pleas filed by the defendant, all of which have been previously adjudicated upon by this court in the cases of State v. Pete, 206 La. 1078, 20 So.2d 368, and State v. Varnado, La.Sup., 23 So.2d 106, 123,

both of which decisions I had the privilege of writing, but I cannot subscribe to the conclusion reached in the majority opinion that an indictment or information charging the defendant with committing "the crime of gambling as defined by Article 90 of the Louisiana Criminal Code," as authorized in Act 223 of 1944, is sufficient to inform the accused of the nature and cause of the accusation against him, as required by Section 10 of Article I of the Constitution of the State of Louisiana, or that such an indictment or information is cured by a bill of particulars.

As pointed out in the Varnado case, "Historically, the right of an accused to be informed in writing of the nature and cause of the accusation against him by the return of an indictment is the result of the assertion of the rights of oppressed peoples against the abuses of the sovereign, and this right has been regarded for centuries as one of the most important securities to the innocent against hasty, malicious, and oppressive prosecutions, as well as one of the immunities and bulwarks of personal liberty. So imbued were our forefathers with the innate justice of this prerogative and so jealously did they guard the security of the citizen against vindictive prosecutions, either by the government, political partisans, or by private enemies, that once they had freed themselves from the shackles of their tyrannical mother country, the original thirteen states were cautiously slow to adopt any form of centralized government without positive assurance that the Bill of Rights would be adopted, and it was adopt-

ed at the very first session of Congress, in 1789, guaranteeing, among other rights, that an accused shall be informed of the nature and cause of the accusation.

"In keeping with these basic and fundamental principles, the drafters of our constitution of 1921 included therein the provision that 'prosecutions shall be by indictment or information' (Section 9 of Article I) and that 'In all criminal prosecutions, the accused shall be informed of the nature and cause of the accusation against him * * *.' Section 10 of Article I.

"It was, therefore, no idle gesture on the part of the commission appointed to draft a Code of Criminal Procedure when it included in this code the provision that all prosecutions must be by indictment or information (Article 2 and Article 216; also, see Article 686 of Dart's Code of Criminal Procedure * * *), and that *The indictment must state every fact and circumstance necessary to constitute the offense* * * *.' Article 227. The commission in including these provisions was but codifying the basic law of this state and the jurisprudence thereunder as it existed at the time the code was adopted. * * *

"As was very aptly stated in Peters v. United States, 94 F. 127, 131, 36 C.C.A. 105 (certiorari denied by the United States Supreme Court, 176 U.S. 684, 20 S.Ct. 1026, 44 L.Ed. 638), 'The true test of the sufficiency of an indictment is not whether it might possibly have been made more certain, but whether it contains every element of the offense intended to be charged, and sufficiently apprises the defendant of what

he must be prepared to meet; and, in case any other proceedings are taken against him for a similar offense, whether the record shows with accuracy as to what extent he may plead a former acquittal or conviction.' " (Italics mine.)

While this court has on numerous occasions passed upon the short form of indictment provided for in Article 235 of the Code of Criminal Procedure as amended prior to its final amendment by Act 223 in 1944, and has maintained the indictment, in each instance it is to be found that in each case the indictment was found to be sufficient to apprise the accused of the nature and cause of the accusation and to give him an adequate foundation or basis for a plea of autrefois acquit or convict in the event of a second trial for the same offense. The information in the instant case does not allege a single fact or circumstance upon which the offense is based. There is nothing in it from which the accused can tell or even guess what act or acts he is being charged with having done. At most it is a mere statement or conclusion of the district attorney. It is barren of any statement which informs the accused or the court of the acts allegedly committed by the accused upon which the prosecuting attorney has based his conclusions. It certainly cannot be said that it contains enough information to enable the accused to prepare his defense and it is in no sense of the word sufficiently definite to be of any value as a bar to further prosecution for the same offense.

It is my opinion, therefore, that that part of Act 223 of 1944 providing "that in all cases of crimes included in the Criminal Code but not covered by the short forms hereinbefore set forth, it shall be sufficient to charge the defendant by using the name and article number of the offense committed" is violative of Section 10 of Article I of the Constitution of 1921 and of the Sixth Amendment to the Constitution of the United States.

I am of the further opinion that the holding in the majority opinion that the bill of particulars furnished by the district attorney in the instant case cured the information is contrary to the universal rule of law that *"A bill of particulars cannot create or cure a defect in the indictment or information. * * * A bill of particulars is not an amendment of the indictment or information, and cannot change the offense charged in the indictment or in any way aid an indictment fundamentally bad."* 27 Am.Jur. 672, Section 112. See, also, State v. Bienvenu, 207 La. 859, 22 So.2d 196, 198. (Italics mine.)

In the Bienvenu case, a very recent decision of this court, the issue was squarely presented thusly: " * * * it is contended on behalf of the State that the bill of particulars filed in each case must be read into the bills of information and that as thus amended the bills of information definitely charge defendant with the crime of gambling as denounced by article 90 of the Criminal Code, which is Act 43 of 1942." To this the court replied: "We do not agree with this contention," stating further: "Conceding, for the sake of argument, that the bill of particulars filed in each of these cases does set forth and describe at great length the gambling business defendant was conducting so as to bring his offense within the provisions of article 90 of the Criminal Code, nevertheless *the fact remains that defendant is not being prosecuted on the bills of particulars, but solely on the. informations. * * ** The sole office of a bill of particulars is to give the adverse party information which the pleadings by reason of their generality do not give and to compel the State to observe certain limitations in offering evidence. *A bill of particulars can not * * * in any way aid an indictment or information fundamentally bad.* Corpus Juris Vol. 31, Indictments and Informations, sec. 310, pp. 752, 753; American Jurisprudence, Vol. 27, Indictments and Informations, sec. 112, pp. 672 and 673. *The rule in this State is in accord with this general rule. * * **" (Italics mine.)

The holding in the majority opinion, contrary to this universal rule of law, is based solely on obiter dictum to be found in the decision of this court in the case of State v. Miller, 170 La. 51, 127 So. 361, 362, wherein the author of the opinion after concluding the ruling of the lower court sustaining the motion to quash the indictment, "based * * * on the ground that the indictment did not give the name of the owner of the money charged to have been stolen, which omission, in the opinion of the. court, was an essential allegation in an indictment for larceny, and was not a

mere matter of defect or form which could be cured by amendment," was erroneous because "ownership of a particular person was not an essential ingredient of the crime of larceny, which is simply the felonious taking and carrying away of the personal goods of another," cited State v. Hanks, 39 La.Ann. 234, 237, 1 So. 458; State v. Harris, 42 La.Ann. 980, 981, 8 So. 530; and State v. Acebal, 110 La. 129, 130, 34 So. 303, as authority for this statement with reference to the essential ingredient of the crime of larceny. Consequently that portion of the opinion in the Miller case relied upon in the majority opinion was not necessary to the decision, hence obiter dictum. Moreover, it was not only not supported by any authority, but as just above demonstrated, was contrary to the law as universally applied in all criminal cases as well as to the constitution of this state. And if not obiter, the Bienvenu case in effect overrules it.

Under the express mandate of our constitution one can only be prosecuted by information or indictment, in which the accused shall be informed of the nature and cause of the accusation against him (Sections 9 and 10 of Article I) and he (the accused) cannot be prosecuted by a bill of particulars. Nor can he be made to request that a bad indictment be made good in this manner. The legislature is powerless to adopt any law to the contrary and this court, in thus judicially legislating on the matter, is violating the mandates of the constitution of this state.